**Robert G. BAKER, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 21154.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 6, 1968.

Decided Aug. 9, 1968.

See also, D.C., 262 F.Supp. 657, and D.C., 266 F.Supp. 456.

Mr. Edward Bennett Williams, Washington, D. C., with whom Messrs. Peter R. Taft and Michael E. Tigar, Washington, D. C., were on the brief, for appellant.

Miss Beatrice Rosenberg, Atty., Department of Justice, with whom Fred M. Vinson, Jr., Asst. Atty. Gen., and Mr. Sidney M. Glazer, Atty., Department of Justice, were on the brief, for appellee.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

PER CURIAM:

Appellant was convicted on seven counts of a nine-count indictment and sentenced to concurrent terms of one to three years on each count. The convictions were for wilfully attempting to evade payment of federal income taxes[1] (Counts 1, 2); larceny[2] and interstate transportation of fraudulently-obtained funds[3] (Counts 3, 5, 7);[4] and assisting another to falsify his federal income tax return[5] and conspiring to defraud the Government and defeat collection of taxes[6] (Counts 8, 9).

---

1. 26 U.S.C. § 7201 (1964):
   *Attempt to evade or defeat tax.* Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony * * *.

2. 22 D.C.Code § 2201 (1967).

3. 18 U.S.C. § 2314 (1964).

4. Counts 4 and 6 were alternative counts to 3 and 5, and charged larceny after trust (22 D.C.Code § 2203 (1967)).

5. 26 U.S.C. § 7206(2) (1964):
   *Fraud and false statements.* Any person who willfully aids or assists in,

or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, or a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document * * *.

6. The conspiracy allegedly had two principal illegal objectives: (a) to violate § 7206, *supra* note 5; and (b) to avoid payment of taxes.

Count 1 charged that appellant had filed a false and fraudulent return for the year 1961, understating his taxable income by approximately $5,000. The Government's case was comprised principally of evidence that, though reporting accurately his salary as Secretary to the Senate Majority, appellant concealed other business income received by him during 1961 by sharing legal fees with his associate, Ernest Tucker, which Tucker declared as his own income. A major part of the Government's proof related to a transaction in which a $5,000 fee due appellant for services rendered by him was paid to Tucker, deposited in Tucker's account and transferred to appellant by Tucker's personal check.

The Government also attempted to show that appellant had failed to report $1,325 in income from a Florida real estate investment and that he had taken two impermissible deductions, totalling $2,113. Appellant countered with evidence that he had failed to take a number of allowable deductions, thereby over-reporting his 1961 taxable income by $2,719. In rebuttal, the Government attempted to prove that a $14,000 profit on the sale of certain stock, reported by appellant as a long-term capital gain, was in fact a short-term gain since the stock had been held less than six months. As to this item, the Government conceded that the erroneous reporting had not been wilful.

Count 2 related to appellant's 1962 income tax return, in which, in addition to his Senate salary, appellant reported business income of $56,412. The Government again reconstructed appellant's outside business income in an attempt to show that he had understated his taxable income by more than $48,000. The Gov-

ernment premised its charge of evasion primarily on evidence that appellant had received $99,600 in cash campaign contributions from executives of various California savings and loan institutions, and that he had stolen the money and failed to report it as income on his 1962 return.[7] Appellant admitted receiving the money, but testified that he had turned all of it over to the late Senator Kerr, who in turn lent $50,000 of it to appellant.[8] A representative of the Internal Revenue Service testified that, accepting as true appellant's version of the facts, his 1962 return slightly overstated his taxable income.

Counts 3 and 5 charged larceny of $67,000, which was part of the $100,000, receipt of which the Government had made the basis of the income tax evasion charge of Count 2. Count 7 charged that the remaining $33,000 had been fraudulently obtained by appellant and thereafter transported by him in interstate commerce.[9]

Count 9 charged a conspiracy among appellant, Wayne Bromley and Clifford Jones to falsify Bromley's and appellant's 1963 and 1964 tax returns, and to defraud the Government in its collecting of appellant's and Bromley's taxes for those years. The Government's evidence showed that during 1962 through 1964 fees for services performed by appellant for a number of clients were paid by checks payable to Bromley on appellant's instructions. In most instances the checks were cashed by Bromley and the proceeds given by him to appellant; on a few occasions, the proceeds of checks cashed by Bromley were retained by him as loans. Several checks payable to Bromley were endorsed and cashed by appellant's secretary.

7. The Government also showed that from April through December, 1962, appellant received monthly cash payments of $250 from a vending machine company for his efforts in procuring a contract.

8. The seven senators and one congressman who were the intended beneficiaries of the contributions testified that they received no contribution from appellant in connection with the November 1962 election on behalf of either himself or others.

9. Two installments were delivered to appellant in Washington by representatives of the savings and loan companies. A third installment, in the amount of $33,000, was delivered to appellant in California and carried by appellant to Washington.

Though, with one exception, he had performed no services for any of these clients, and had given most of the fees to appellant, Bromley expressly agreed, at least as to the fees from two of the clients, that he would report the money on his tax return, with appellant to reimburse him for any added tax liability incurred as a result.

During 1963 a total of $11,000 from three different clients was received by Bromley and given by him to appellant. In addition, Bromley and appellant split a $5,000 fee for services in connection with the securing of a national bank charter, which had been paid by a check made out to Bromley.

In his testimony at trial, appellant admitted these facts, except that he denied there was ever any agreement for Bromley to report the fees as his income and then to be reimbursed by appellant for the added taxes. He testified that his reasons for using Bromley as an intermediary in 1963 and 1964, just as his earlier arrangement with Tucker, were that he was not a member of the District of Columbia Bar and that he had been instructed by his employer, the Majority Leader of the Senate, not to engage in the private practice of law.[10] Appellant reported on his 1963 return all the fees received through Bromley, that is, the $11,000 plus his share of the $5,000 bank charter fee.[11]

In December 1964, two months after he had filed his own 1963 return, appellant visited Bromley and assisted him in pre-paring his income tax return for 1963. Appellant advised Bromley to list the $11,000 in fees which had been given to appellant on the lines for "gross receipts" and "gross profit" on Schedule C of the return, and then to deduct that sum as "legal and professional fees."[12] Bromley drew up his return in accordance with these instructions, and filed it on December 30, 1964.

The assistance rendered by appellant in the preparation of Bromley's 1963 tax return gave rise to Count 8 of the indictment, which charged that he had wilfully counseled and assisted in the preparation of a materially false and fraudulent return. The defense sought, through cross-examination of Government witnesses and through the testimony of appellant and certain expert witnesses, to show that the reporting method employed was lawful and proper, and that appellant in recommending it to Bromley had relied on the advice of tax counsel and an accountant. The Government on cross-examination attempted to demonstrate that appellant had not disclosed all relevant facts to his counsel.[13]

Appellant filed a number of pretrial motions, including a motion for severance, a motion for discovery and inspection of grand jury minutes and a motion to suppress evidence illegally obtained through electronic surveillance, all of which were denied on December 20, 1966, United States v. Baker, 262 F.Supp. 657 (D.D.C.1966). A motion to strike the jury panel was filed and denied on Janu-

10. An officer of one corporation which had retained appellant's services in 1964 testified that the fee payment scheme was suggested by appellant as a means of avoiding unfavorable publicity, after it had been indicated that the corporation was reluctant to employ appellant because of the public investigation of appellant's affairs which had been commenced by various agencies of the Federal Government in the fall of 1963.

11. Appellant's 1963 return was filed in October 1964 and was prepared with the advice and assistance of appellant's tax counsel.

12. Bromley also listed the entire $5,000 bank charter fee as his income, without deducting it as he had done with the $11,000, despite the fact that appellant had already reported half of that sum on his 1963 return. According to appellant, this was done on the advice of his attorney, in order to "bend over backwards" and obtain leverage for the then inevitable negotiations with Internal Revenue authorities.

13. Appellant admitted he had not disclosed to his attorney the earlier meetings among appellant, Bromley and Jones, and the agreement to have Bromley pay tax on appellant's income.

ary 9, 1967, the day on which the trial commenced. During the trial, renewed severance and suppression motions were denied. The District Court also denied appellant's motion for a new trial. United States v. Baker, 266 F.Supp. 461 (D.D.C.1967).

On this appeal, appellant raises three points applicable to all seven counts upon which judgments of conviction were entered, relating to (1) alleged irregularities in the jury selection procedure; (2) the court's refusal to grant separate trials on various counts of the indictment; and (3) the court's handling of the electronic eavesdropping questions raised in appellant's suppression motions. In addition, appellant contends that the court erred in failing to direct a judgment of acquittal on Count 1, and in permitting the Government to introduce rebuttal evidence outside the scope of the indictment and the Government's bill of particulars; that the court improperly restricted the scope of cross-examination of Government witnesses who gave testimony on Counts 2, 3, 5 and 7; that the court usurped the jury's function in entering judgments of conviction on Counts 3, 5 and 7 not in accordance with the ju-

ry's verdicts; that the conviction on Count 8 should be reversed since it stated no offense as a matter of law, and because the evidence on that count was insufficient and the court's instructions inadequate; and lastly, that the court's instructions on Count 9 were inadequate and misleading.

## I. THE JURY ISSUE

Appellant contends his conviction should be set aside because he was convicted by an illegally impaneled jury. This contention is based upon the following assertions: (1) a partial voir dire was conducted out of the presence of appellant and his counsel, (2) the array was illegally summoned, (3) the jury was stacked with Government employees, and (4) the Jury Commission drew the panel by use of an improper questionnaire and acted under an unconstitutional statutory provision, 11 D.C.Code § 2301(b) (1967). We find no merit in these allegations, only the first three of which require detailed comment.[14]

As to the first of these contentions, appellant claims that criminal defendants have the right to be present and represented during voir dire [15] and that a par-

---

14. Although some of the questions in the Jury Commission's questionnaire could usefully be re-evaluated, we are unpersuaded that the utilization of the questionnaire requires reversal. We find nothing in the record to indicate that a specific group or class was intentionally or systematically excluded by the Jury Commissioners or that the array was an unrepresentative and partial cross-section of the community. See Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985–986, 90 L.Ed. 1181, 166 A.L.R. 1412 (1946), where the Court stated:

> The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. * * * This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be

selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. * * *

We also find no merit in appellant's assertion that 11 D.C.Code § 2301(b), in exempting women from jury service at their option, is unconstitutional because it arbitrarily and capriciously discriminates between women and men, and distorts the jury system's representative character. In the first place, the representative character of this jury was not affected by the exemption in that there were six women on the jury. Second, the Supreme Court in Hoyt v. State of Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), held a Florida statute, which is very similar to § 2301(b), to be constitutional on its face and as applied to the facts of the case.

15. See the Fifth Amendment, the Sixth Amendment, and FED.R.CIV.P. 43.

tial voir dire was conducted in his absence on January 4, 1967,[16] when 335 prospective jurors allegedly drawn specially for the Baker case were questioned as to their qualifications to serve as jurors. Appellant contends that the examination descended from general qualifications to particular suitability for the Baker case itself.[17] While the Government concedes that, if a voir dire was in fact conducted, appellant was entitled to be present and represented, it argues that the only purpose of the January 4th proceeding was to ascertain the general qualifications of prospective jurors and to provide them with the opportunity to present their reasons for wishing to be excused from jury service. The record discloses that the trial judge, after telling the prospective jurors they had been summoned for general January duty, had the clerk ask the array a number of general questions.[18] While hearing individual excuses, the judge, at the bench, informed at least five prospective jurors that jurors from this panel would be hearing the Baker case, and three of these prospective jurors were excused. The Government admits that appellant's name was mentioned to five veniremen, but argues that this is irrelevant since none of the five was ultimately selected.[19]

We find appellant's arguments unpersuasive for several reasons. In the first place, although the District Court correctly decided that the January 4th proceeding was an administrative preliminary designed to test the qualifications and the availability of persons drawn to serve as jurors generally, and was not a "stage" or "step" in the trial, the issue is of no consequence because the three prospective jurors who were excused on January 4th would have been excused on January 9th when the case was called for trial in any event. Of the three people excused in the initial proceedings, one said she had formed an opinion as to appellant's guilt, another stated he knew appellant's attorneys and was apparently aiding a United States Attorney, and the third was excused because his employer could not get anyone to replace him.[20] Thus, assuming *arguendo* there was a partial voir dire, it was at most harmless error to have conducted the January 4th proceeding in the absence of the defendant.[21] Second, assuming the trial judge should not have made any reference to appellant, it is far too speculative to say that, because his name was mentioned to five prospective jurors who were not ultimately selected, the jury was so biased it could not reach a fair and impartial verdict.[22] On trial the court's voir dire questions were specifically drafted to ascertain whether any juror was familiar with the Baker case and had formed an opinion as to his guilt or

---

16. The actual trial began on January 9, 1967.

17. Appellant does not claim that defendants are entitled to participate in the examination, by the Chief Judge or his designate, of all prospective jurors summoned.

18. See 11 D.C.Code §§ 2301–2302 (1967). In addition to these statutory qualification questions, the jurors were asked if anyone was a special police officer.

19. Three of the five were excused during the initial proceeding on January 4. One of the other two was excused at the voir dire examination and the other was not called.

20. The truth of these assertions has not been attacked by appellant.

21. *See* Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

22. If we were to reverse on this point, we would have to assume: (1) That the five informed the rest of the prospective jurors that they were to hear the Baker case, and the jurors eventually selected had read all they could about Baker between January 4th and the 9th, forming an opinion as to his guilt; and (2) either that the voir dire questions were so poorly drafted that the jurors' preconceived notions of guilt or innocence were not exposed, or that the jurors committed perjury.

innocence.[23] Since these questions were sufficiently exploratory and there is no allegation of perjury in the answers thereto, we cannot conclude that appellant was prejudiced by the January 4th proceeding.

Another point raised by appellant is that his jury panel was illegally summoned. This assertion is grounded on the fact that the trial judge ordered the Jury Commission to draw additional names for January service.[24] The District Court apparently based this action upon 11 D.C.Code § 2309 (1967)[25] and the fact that he knew additional names would be necessary to obtain a jury for this case. Appellant attacks the call for additional jurors on two grounds: (1) the District Court's reliance on § 2309 is not justifiable because this section, read in conjunction with the other jury selection provisions[26] and with District Court Rule 18,[27] is part of a uniform procedure for summoning a single pool of jurors for service on all cases to be heard during a particular month, and this section does not provide for the calling of additional jurors or special veniremen for a particular case, and (2) the trial judge violated the ten-day provision of 11 D.C.Code § 2306.[28]

Although the District Court possibly should have foreseen this problem and either increased the January jury call or held the case over until February, we find no prejudicial error resulted from the procedure utilized by the trial judge. We think he did have the power to request additional jurors in view of the circumstances. Second, even if, as appellant contends, the additional jurors were not placed in the general pool until after appellant's jury was drawn,[29] we find no reversible error be-

23. For example: "Have any of you read about the charges which the Government has brought against Mr. Baker in this indictment?" "Now has anyone read so intensively about this case in the papers or by listening to the radio or television that they have formed an opinion as to guilt or innocence of the defendant? It is very important if there are such, that you stand and state your number and your name." "If you sit in this case, under your oath as a juror you will be required to put out of your mind completely anything you ever heard about this defendant. You will be required to focus your attention exclusively on the charges brought in the indictment here and the evidence offered by the prosecution and the defense and received in this Court room. Do any of you feel that you have read or heard so much about this case that you will be unable to do this?"

Upon appellant's counsel's urging, the judge asked the jury one last question after the original questions had been read: "Do any of you as a result of reading about Mr. Baker, or hearing about Mr. Baker, have an opinion about him as a person?"

24. 335 names were drawn pursuant to this request and directed to appear before the trial judge on January 4, 1967. Of these 335, 175 were eventually accepted for jury duty.

25. When persons drawn as grand or petit jurors cannot be found, or prove to be incompetent, or are excused from service by the court for which their names were drawn, the jury commission, under the order of the court, shall draw from the box the names of other persons to take their places, and if, after the organization of the jury, vacancies occur therein, the commission shall fill them in like manner.

26. *See* 11 D.C.Code §§ 2305–2307, 2310 (1967) and 28 U.S.C. § 1866(a) (1964).

27. Rule 18 provides: "Petit jurors shall be assigned to a single jury pool and reassigned for service among the divisions of the Court upon the request of each Trial Judge."

28. (a) Grand and Petit Jurors for District Court.—At least ten days before the commencement of each term of the United States District Court for the District of Columbia, at which jury trials are to be had, the jury commission shall:
    (1) publicly break the seal of the jury box and draw therefrom, by lot and without previous examination, the names of such number of persons as the court directs to serve as grand and petit jurors in the court; and
    (2) forthwith certify to the clerk of the court the names of the persons so drawn as jurors.

29. Apparently the trial judge does not agree with appellant's contention. He stated in response to appellant's counsel's attempt to get the Government to stipu-

cause the processing of these additional jurors, with the exception that appellant's name was mentioned to the five above referred to, was in accord with normal procedures. Moreover, there is no indication that the District Court intended this to be an abnormal event, and the number of prospective jurors called did provide an adequate base from which the jury was selected.[30]

■ As far as § 2306 [31] is concerned, we find no reversible error in the District Court's failure to comply with the ten-day provision. The statute does not provide that the list of jurors must be sent to defense counsel and there is no indication that the purpose of the ten-day provision was to aid defendants. There is a federal statute [32] which provides that a defendant in a capital case is entitled to a list of veniremen three days prior to trial, but there is no similar provision for non-capital cases.[33] Furthermore, the appellant has not demonstrated he was prejudiced by this failure to draw the jurors ten days before trial.[34]

Appellant also submits that his conviction should be reversed because he was convicted by a jury made up solely of Government employees. He contends this court could base reversal on either of the following: (1) the all Government employee jury resulted from the District Court's decision, over defense counsel's objection, to sequester the jury and its concomitant free-excuse policy, and (2) an all Government employee jury is inherently prejudicial in a case involving charges of multiple wrongdoings by a highly-placed Government official. We are not persuaded by these arguments. Although the jury finally selected did consist entirely of present or retired Government employees, we do not think this was a result of an easy-excuse policy or sequestration. In our opinion the record not only does not reflect an intent on the part of the District Court to exclude non-Government workers but the excuses granted were not conducive to the forming of an all Government employee jury. The District Court did not readily excuse everyone who did not want to serve and each excuse was considered individually.[35]

late that the Baker jury was picked from the array impaneled on January 4: "I do not think that this is the fact, Ed. I just checked with my clerk and I sought to have him call first jurymen from the old list, from the originally called list. He told me that people in the jury lounge had mixed up the slips. So that was impossible as of the time he said at the time I spoke to him." Trial Tr. p. 193.

30. See note 24 *supra* and note 34 *infra*.

31. See note 28 *supra*. We note that the District Court did not think this section applied to filling vacancies under § 2309 but find it unnecessary to reach this issue.

32. 18 U.S.C. § 3432 (1964).

33. *See* Stone v. United States, 324 F.2d 804 (5th Cir.), cert denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1963); Wagner v. United States, 264 F.2d 524, 528 (9th Cir. 1959); Hamer v. United States, 259 F.2d 274, 278–279 (9th Cir.), cert. denied, 359 U.S. 916, 79 S.Ct. 592, 3 L.Ed.2d 577 (1958); Hendrikson v. United States, 249 F. 34 (4th Cir. 1918).

34. Appellant contends that, if the ten-day provision had been followed, he would have discovered that the man who became the foreman of the jury was a reserve lieutenant in the Metropolitan Police Department. We think the District Court adequately handled this problem, *see* United States v. Baker, 266 F.Supp. 461, 462–463 (1967), and we do not think Buchanan was a police officer within the meaning of the applicable statute. He had not been a special police officer since the Presidential inauguration in 1965, and his service in the reserve corps of the police department was completely voluntary and without compensation.

35. The record shows that, after the trial judge told the panel he was going to sequester the jury and the trial might last as long as ten weeks, 54 people— 32 Government or retired Government employees and 22 non-Government or housewives—asked to be excused; and it appears only three were excused for private employment reasons. At this juncture, there were 105 who had not asked to be excused. The trial court,

In any event the granting of excuses is a discretionary matter, and we find no basis in the record for holding that the District Court abused this discretion. In short, the record shows that neither the trial judge nor the parties deliberately or consciously attempted to exclude, or to include, a certain class and thereby to prevent a cross-section of the community from sitting on the jury.[36]

■ The decision to sequester the jury is also a discretionary matter. *See* Carter v. United States, 102 U.S.App.D.C. 227, 231, 252 F.2d 608, 612 (1957). Appellant submits that the sequestering of the jury was not justifiable because there were no exceptional circumstances as required by this court's decision in Coppedge v. United States, 106 U.S.App. D.C. 275, 272 F.2d 504 (1959). The Government, however, submits that the trial judge did not abuse his discretion and there were exceptional circumstances involved. We think that the following facts support the Government's position: (1) Appellant was a prominent national figure whose activities had been highly publicized by the communications media, (2) he had himself moved to dismiss the indictment on the ground that the grand jury was biased because of "extensive and intensive publicity," (3) the court had been informed that *Newsweek* was planning to release, in about three weeks, a cover story on one of appellant's attorneys, and (4) many television and radio stations and newspapers had requested accommodations in the courtroom.

■ Finally, for several reasons, we reject appellant's claim that an all Government employee jury was prejudicial. The Supreme Court in Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L. Ed. 187 (1948), which was followed in Dennis v. United States, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950), held that bias is not imputed to Government employees simply because of their employment status, but they are subject to challenge for actual bias.[37] Although the Court in *Frazier* relied heavily upon the manner in which the defense counsel had used his peremptory challenges [38] and the fact that the jury was properly selected, we think that, even though appellant asserts technical irregularities in the selection of the jury in this case, the following statement by the Court is still applicable to the instant problem:

In ruling upon petitioner's objection the trial judge assessed the situation as follows: "Chance has resulted in this jury panel of twelve being composed of Government employees, but the jury list from which they by chance were selected is a mixture of Government employees and private employees." Even in this view of what took place, petitioner has no cause to

concluding that there was an adequate number willing to serve, excused 16, 11 of whom had asked to be excused previously; nine of these were Government employees. Appellant's counsel did not object to this proceeding.

36. It appears that the names placed in the jury box from which the potential jurors were drawn embraced all classes of people, and there is no doubt that many were Government employees, but we think this is a result of the preponderance of Government employees over privately employed people in the District of Columbia.

37. The question of the presence of Government employees on District of Columbia juries was also considered by the Supreme Court in United States v. Wood, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed.

78 (1936), and Crawford v. United States, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465 (1909). In *Crawford*, the first case in which this problem arose, the Court concluded that a Government employee could be challenged for cause when the Government was a party. In 1935, Congress, apparently prompted by a paucity of qualified jurors caused by the *Crawford* decision, enacted 11 D.C. Code § 1420 (1940) which provided that Government employees, if otherwise qualified, shall be able to serve as jurors. *See* 11 D.C.Code § 2302 (1967); the amendment and repealer section of the new Jury Selection Act, Pub.L. 90–274, 90th Cong., 82 Stat. 53 (1968). The constitutionality of this 1935 statute was upheld in United States v. Wood, *supra*.

38. In this case appellant's counsel did not use all of his peremptory challenges.

complain. The well-settled rule is that, given a lawfully selected panel, free from any taint of invalid exclusions or procedures in selection and from which all disqualified for cause have been excused, no cause for complaint arises merely from the fact that the jury finally chosen happens itself not to be representative of the panel or indeed of the community. There is, under such circumstances, no right to any particular composition or group representation on the jury.

*Id.* at 507–508, 69 S.Ct. at 207. (Footnote omitted.) Since there is no bias imputed to a juror because of his employment status,[39] we cannot base reversal on the mere fact that the jury consisted entirely of Government employees; and appellant has made no showing that any of the individual jurors was actually biased. Furthermore, one of the voir dire questions asked was: "Would you feel in any manner embarrassed in your employment with your supervisors or otherwise, if the jury of which you were a member returned a verdict of not guilty, in view of the fact that the Government is a party to this action?" Finally, if appellant sincerely felt he could not obtain an impartial and representative jury in the District of Columbia, he could have moved for a change of venue.

## II. THE SEVERANCE MOTIONS

In his pretrial motion for severance appellant asserted that the various counts of the indictment, with the exception of 3, 4, 5 and 6, were improperly joined under Rule 8(a) of the Federal Rules of Criminal Procedure,[40] and that even if properly joined a severance should be granted pursuant to Rule 14,[41] because of the likelihood of prejudice.

At oral argument on this motion, appellant's counsel represented that in his view a "reasonable severance," in light of "the basic dictates of fairness," would be to try together Counts 1 and 2, Counts 3 through 7, and Counts 8 and 9.

In denying appellant's motion, the District Court observed, first of all, that "Defendant concedes" the propriety, under Rule 8(a), of joining Count 1 with Count 2, Count 8 with Count 9, and Count 3 with Counts 4, 5, 6 and 7.[42] The judge then proceeded to consider whether "Counts 1 and 2 may be properly joined with Counts 8 and 9 and whether these four counts may be joined with Counts 3 through 7."[43] He concluded that Counts 1, 2, 8 and 9 were of "similar character," that the "theft counts" (3–7) were "connected together" with Count 2, and that all the counts were therefore properly joined.[44] He added that:

all the counts of the indictment reflect a "common scheme or plan" whereby the defendant obtained large sums of money which constituted taxable income while concealing the same from the Internal Revenue Service by falsifying the tax returns of himself and others. \* \* \*[45]

---

39. *See* Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948); Smith v. United States, 86 U.S.App.D.C. 195, 180 F.2d 775 (1958).

40. FED.R.CRIM.P. 8(a):
"*Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

41. FED.R.CRIM.P. 14:
"Relief from Prejudicial Joinder. If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

42. United States v. Baker, 262 F.Supp. 657, 685 (D.D.C.1966).

43. *Ibid.*

44. *Id.* at 685–686.

45. *Id.* at 686.

On the Rule 14 aspect of the motion, the District Judge recognized that discretionary relief from prejudicial joinder was available notwithstanding that the counts were properly joined under Rule 8(a). He held, however, that because of the "considerable overlap of proof" among the various counts, appellant had not made a sufficient showing that he would be prejudiced by the "cumulative effect" of the proof relating to different counts to warrant the exercise of such discretion.[46] As to the "more serious" question whether appellant might be prejudiced because of his desire to testify on some counts but not on others,[47] he concluded that the possibility of such prejudice was "problematical" at that stage of the proceeding.[48] He therefore denied the request for Rule 14 relief "without prejudice" to its renewal:

> If, at trial, the defendant decides he wants to testify only in respect to one series of the joined offenses, it will be open to him to renew his motion and to demonstrate what actual prejudice he would incur by testifying on the joined offenses.[49]

One week later, in a pretrial conference, appellant's attorney represented that there was a "sharp difference" in appellant's position with respect to testifying on Counts 1 through 7 and testifying on Counts 8 and 9. Though he was unwilling to reveal in Government counsel's presence which set of counts appellant wished to testify on, he indicated his readiness to disclose to the court *in camera* appellant's exact intentions.[50] He argued further that if the question of severance were deferred until after the close of the Government's case substantial prejudice would already have accrued from the joint trial. Finally, he represented that the defense would be satisfied with separate trials of Counts 1 through 7 and Counts 8 and 9, and that if such a severance were granted he would "not argue as a basis for appeal" the failure to sever other counts. Following this colloquy the District Judge indicated that he would not "rule right now on this question. I want to think it over and perhaps from time to time have the reporter read back to me what has been said."

The severance question was again brought up during trial, at the close of the Government's case. Appellant's counsel argued that if appellant were to take the stand and testify on certain counts but not on others, it would be a "dramatic underscoring of his invocation of the Fifth Amendment which * * * would be prejudicial to him with respect to the counts on which he did not testify." He made clear, however, that because the Government had already introduced its evidence on all nine counts, the defense was not seeking simply an election by the Government as to which set of counts (1 through 7 or 8 and 9) it would go forward on, but that the relief requested was the declaration of a mistrial. At that point, the court stated: "Well, in view of that, counsel, the Court will deny your motion and go forward."

Though he had apparently not done so previously, appellant's counsel then announced for the record appellant's desire to testify on Counts 1–7 but not to testify on Counts 8 and 9, and the reasons for his decision. He explained that in his opinion appellant had a "valid legal defense to 8 and 9," and added:

> And, secondly, we believe that there is a strong possibility that the defendant's testimony in defense of eight and nine, might form a chain, incriminatory in nature, *vis-a-vis* the conflict of interest statutes of the United States which have not yet been barred by the Statute of Limitations insofar as prosecutions are concerned.

---

46. *Id.* at 686–687.

47. See Cross v. United States, 118 U.S. App.D.C. 324, 335 F.2d 987 (1964).

48. 262 F.Supp. at 687.

49. *Ibid.*

50. The Government attorney interjected that "I wouldn't ask for it," and the District Judge remarked, "I am not trying to seek any information."

On appeal, appellant challenges both the District Court's conclusion that there was no Rule 8 misjoinder, and its refusal to grant relief under Rule 14. We deal with these contentions separately.

### a. *Misjoinder—Rule 8(a)*

Appellant attacks, first of all, the District Judge's finding that he "conceded" the joinability of Count 1 with Count 2, Count 8 with Count 9, and Count 3 with Counts 4, 5, 6 and 7. He contends that his remarks as to a "reasonable severance" were made in the context of his request for Rule 14 relief, and were not intended as a concession of proper joinder under Rule 8(a). Whether or not counsel's statement was properly understood as an abandonment of his Rule 8 claim as to these subsidiary joinders, we think it is clear that Counts 1 and 2 were joinable as charging offenses of the same character; that Counts 3 through 7 were joinable, whether as charging offenses of the same or similar character or as offenses based on acts or transactions connected together or constituting parts of a common scheme or plan; and that Counts 8 and 9 were joinable, whether as offenses of similar character or as based on acts or transactions connected together or constituting parts of a common scheme or plan. And appellant makes no argument to the contrary, except to deny that he "conceded" these points below.

Similarly, there can be little question as to the joinability of Counts 1 and 2 with Counts 8 and 9, and Counts 3 through 7 with Count 2. Count 9 (the conspiracy count), like Counts 1 and 2, charged conduct whose purpose was to fraudulently understate appellant's income and thus avoid payment of tax. Indeed, the income-splitting scheme involved in Count 9 was nearly identical to the arrangement with appellant's associate, Tucker, which formed a major part of the Government's proof under Count 1. And we do not view it as material that Count 9 charged an unfulfilled conspiracy while Count 1 alleged actual nonreporting. As to Count 8, we think that counselling another to file a false return, with intent to deceive the Government, is conduct at least "similar" in nature to the wilful giving of false information on the defendant's own return.[51] Moreover, the acts which gave rise to Count 8 were intimately related to—and, on the prosecution's theory, the product of—the conspiracy charged in Count 9.

In concluding that Counts 3 through 7 were "connected together" with Count 2, the District Judge noted that the cash alleged to have been stolen in the former counts was that alleged to have been unreported in the latter, and thus that there would be a "complete overlap of proof":

> [I]f a separate trial were ordered for the "theft" counts, the Government would still be faced with proving those counts in order to establish the source of the defendant's unreported income as charged in Count 2. * * * [52]

■ We agree with the court's conclusion on this point. In determining whether offenses are based on "acts or transactions connected together," the predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction need only be proved once.[53] In view of this rationale, and the fact that the tax evasion charge could not be proved without establishing the theft as well, the District

---

51. *Cf.* United States v. Mack, 249 F.2d 321, 326 (7th Cir. 1957), cert. denied, 356 U.S. 920, 78 S.Ct. 704, 2 L.Ed.2d 715 (1958); United States v. Citron, 221 F.Supp. 454, 456 (S.D.N.Y.1963); *see* United States v. Hoffa, 349 F.2d 20, 42 (6th Cir. 1965), aff'd, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Patterson v. United States, 324 F.2d 310 (5th Cir. 1963). *But see* United States v. Quinn, 365 F.2d 256 (7th Cir. 1966).

52. 262 F.Supp. at 686.

53. *See* Nixon v. United States, 352 F.2d 601 (5th Cir. 1965); Dranow v. United States, 307 F.2d 545, 560 (8th Cir. 1962); Williams v. United States, 265 F.2d 214, 216 (9th Cir. 1959); United States v. Gottfried, 165 F.2d 360, 363 (2d Cir. 1948); Scheve v. United States, 87 U.S.App.D.C. 289, 290, 184 F.2d 695, 696 (1950); 8 J. MOORE, FEDERAL PRACTICE, ¶ 8.02 [1] (Cipes ed. 1967).

Court's conclusion that the offenses were "connected together" was fully warranted.

■ A more difficult question is whether, given these conclusions, a proper basis existed for joining all nine counts in a single indictment. The District Judge evidently felt that since Counts 1, 8 and 9 were joinable to Count 2, as offenses of the same or similar character, and since Counts 3 through 7 were joinable to Count 2 as connected offenses, it was proper to join all nine counts.

On appeal, the Government argues that "since * * * the 1962 income tax charges, which inevitably required a finding as to conversion, were properly joined with the tax charges for 1961 and 1963–1964, the conversion charges were properly included in the indictment." We do not understand the Government's argument to be that counts joinable to a common count are always joinable to each other, but rather that where transactions are properly joined all offenses arising out of each transaction should be tried at the same time, unless to do so would unduly or prejudicially complicate the proceeding.

Apparently as an alternative basis for upholding[54] joinder, the trial court found the indictment as a whole to reflect a "common scheme or plan." In supporting this ground, the Government argues that all the violations charged constituted part of a common scheme or plan "whereby appellant endeavored to conceal from the internal revenue authorities significant sources and amounts of income obtained outside his official employment." It relies heavily on Daly v. United States, 119 U.S.App.D.C. 353, 342 F.2d 932 (1964), cert. denied, 382 U.S. 853, 86 S.Ct. 102, 15 L.Ed.2d 91 (1965), in which this court upheld the joinder against a single defendant of 27 counts—charging false pretenses, unlawful practice of the healing arts, unlawful possession of drugs and unlawful delivery of drugs—noting that the offense with which the defendant was essentially charged was "falsely holding himself out to the public as a licensed physician, and of performing acts in the course of that deception which a layman is forbidden to do." *Id.* at 354, 342 F.2d at 933. The Government argues that here, "appellant's efforts to hide the sources and amounts of income he personally received outside his Government employment was the nexus of all the statutory violations."[55]

We need not rely on either of these theories in order to reject appellant's claim that reversal is required because of misjoinder. For we think it is clear that, whether or not the theft counts could properly be joined with the four income tax counts, appellant was not harmed by any error in that regard. We have held that the four income tax counts could properly be tried together, since they were joinable as offenses of the same or similar character. As we have noted, evidence of the larceny was a necessary part of the proof of the 1962 tax evasion charge, and thus would have been admissible in any such joint trial. Addition of the theft counts, therefore, was in no way prejudicial to appellant insofar as his conviction on the tax charges is concerned.

It is true that the joint trial may have prejudiced appellant in defending against the larceny charges, since evidence not only of the "connected" 1962 offense was admitted but also evidence of unrelated income tax offenses for other years. But the concurrent sentences im-

54. *See* Williams v. United States, 115 U.S. App.D.C. 134, 317 F.2d 545 (1963) (*per curiam*); Chambers v. United States, 112 U.S.App.D.C. 240, 301 F.2d 564 (1962); Dunaway v. United States, 92 U.S.App.D.C. 299, 300, 302 n. 7, 205 F.2d 23, 24, 25 n. 7 (1953); Gregory v. United States, 125 U.S.App.D.C. 140, 144, 369 F.2d 185, 189 (1966) (dictum). *But cf.* Cupo v. United States, 123 U.S.App.D.C. 324, 359 F.2d 990 (1966); Ward v. United States, 110 U.S.App.D.C. 136, 289 F.2d 877 (1961).

55. *But see* United States v. Quinn, *supra* note 51.

posed by the District Court make unnecessary any inquiry by us into the possibility of such prejudice.[56]

■ Appellant, however, contends that we are precluded from holding that any error as to joinder of counts was harmless—that upon a finding of Rule 8 misjoinder the court must *ipso facto* reverse the conviction "without pausing to consider whether the error was prejudicial." The Government's response is to inquire why the harmless error rule (Fed.R.Crim.P. 52(a)) should be inapplicable in this one situation when it applies to all other types of error, even, in a qualified form, to error of constitutional dimension.[57]

Appellant's reasoning seems to be that the necessary implication of the Rule's provision that certain offenses "may" be joined is that offenses not within its terms may *not* be joined; and that any inquiry into prejudice after a finding of misjoinder would be effectively to read Rule 8 out of the law, since Rule 14 makes separate provision for dealing with *prejudicial* joinder.

But we think this argument ignores an important distinction between the prejudice that compels an appellate court to reverse for trial *error*, and the prejudicial effect of joinder, even when proper, which a trial judge must weigh in exercising his Rule 14 discretion. Because of the language of Rule 8 and the relationship of Rule 8 to Rule 14, it may

readily be conceded that a trial judge has no discretion to deny a motion for severance when counts are misjoined, and that to do so would be error.[58] But that leaves unresolved the question whether the defendant was harmed thereby. As Judge Friendly has said, "We see no reason why the undoubted truth that an appeal claiming misjoinder under Rule 8(b)[59] raises a question of law in the strict sense, whereas an appeal from denial of severance under Rule 14 normally raises only one of abuse of discretion, should carry exemption from the harmless error rule * * * as a corollary." United States v. Granello, 365 F.2d 990, 995 (2d Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967).

It has been said that "any form of joinder not permitted by the terms of * *. * Rule [8] * * * is *conclusively* presumed prejudicial."[60] In our view, however, this statement is too broad if it means that a violation of Rule 8 may never be deemed harmless. When unrelated offenses committed by separate defendants are joined for trial, in violation of Rule 8(b),[61] no further inquiry into special prejudice is required.[62] Such a rule is justified since the introduction at the trial of one defendant of evidence which in law is relevant only to the guilt of another *in itself* is prejudicial, and it would be inappropriate to speculate as to the extent to which that evidence may

---

56. Hirabayashi v. United States, 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *cf.* Patterson v. United States, *supra* note 51, 324 F.2d at 311 (alternative ground).

57. Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

58. "[W]here multiple defendants are charged with offenses in no way connected, and are tried together, they are prejudiced by that very fact, and the trial judge has no discretion to deny relief." Ingram v. United States, 272 F.2d 567, 570 (4th Cir. 1959).

59. FED.R.CRIM.P. 8(b):
Joinder of Defendants. Two or more defendants may be charged in the same

indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

60. 8 J. MOORE, FEDERAL PRACTICE ¶ 8.02 [1] at 8–4 (Cipes ed. 1967).

61. Note 59, *supra*.

62. Cupo v. United States, *supra* note 54, 123 U.S.App.D.C. at 327, 359 F.2d at 993; Ward v. United States, *supra* note 54, 110 U.S.App.D.C. at 137, 289 F.2d at 878; Ingram v. United States, *supra* note 58, 272 F.2d at 570.

have affected the deliberations of the jury or embarrassed the defendant in presenting his defense.[63] But in a case where it is clear that "no prejudice from the joinder could have occurred," we perceive no reason for ignoring the harmless error rule.[64]

b. *Prejudicial joinder—Rule 14*

In Drew v. United States, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), we described the principal reasons why a defendant may be prejudiced by joint trial of offenses, even if proper under Rule 8:

(1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.[65]

The District Judge weighed the possibility of such harm in ruling on appellant's pretrial severance motion.[66] He noted the "considerable overlap of proof" between Count 2 and Counts 3 through 7, and between Counts 8 and 9, from which

he concluded that "whatever cumulative effect, if any, the presentation of proof in this case [has] would not be eliminated by severing the various counts."[67] And he found "no indication that defendant's case will not be presented to and impartially considered by a trier of facts under proper instructions on the law applicable to evidence appropriately admissible."[68]

In *Drew*, we recognized that the principal elements of prejudice from a joint trial are largely absent in a situation where evidence of each of the joined offenses would be admissible in a separate trial for the other, under the rules governing admissibility of "other crimes" evidence.[69] The standard we there laid down requires a severance unless evidence of the joined offenses would be mutually admissible, or if not, the evidence is sufficiently "simple and distinct" to mitigate the danger of cumulation.[70]

The Government does not claim that all the details of its proof under Counts 1, 2, 8 and 9 would have been mutually admissible in separate trials [71] but asserts that significant portions would properly have been received, and with this we agree. Wilfullness was an element of each of the income tax offenses charged, and evidence as to intent was of prime importance. Evidence of prior false reporting, failure to file or failure to pay taxes due is commonly received in in-

---

63. In Ingram v. United States, *supra* note 58, the court noted, 272 F.2d at 570, that the improper joinder had permitted evidence "against one defendant to be presented in the case against another charged with a completely disassociated offense, with the danger that the jury might feel that the evidence against the one supported the charge against the other." *See* United States v. Granello, 365 F.2d 990, 995 (2d Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967).

64. United States v. Granello, *supra* note 63, 365 F.2d at 995; Patterson v. United States, *supra* note 51.

65. 118 U.S.App.D.C. at 14, 331 F.2d at 88.

66. 262 F.Supp. at 686–687.

67. *Id.* at 687.

68. *Ibid.*, quoting from United States v. Steel, 38 F.R.D. 421, 424 (S.D.N.Y.1965).

69. 118 U.S.App.D.C. at 16, 331 F.2d at 90.

70. 118 U.S.App.D.C. at 16–18, 331 F.2d at 90–92.

71. Appellant makes no contention on appeal that the trial judge abused his discretion in failing to sever Count 1 from Count 2, Count 8 from Count 9, or any of the larceny counts from the others, and we need not decide whether his pretrial "concession," for Rule 14 purposes, would preclude him from doing so.

come tax cases as bearing on intent.[72] Such evidence need not relate to prior acts of precisely the same character, but is admissible as broadly probative of the defendant's "attitude toward reporting and payment of taxes generally." [73] Moreover, the evidence relating to Counts 1 and 2 would have had particular relevance to appellant's defense of reliance on advice of counsel as to Counts 8 and 9, as showing prior wilful deception of the Government at a time before that when counsel's advice was sought.[74] And we think it is also true that evidence of the offenses charged in 8 and 9 would have been admissible in a trial of 1 and 2, notwithstanding that the former evidence would relate to years subsequent to those at issue.[75]

Thus, evidence as to Counts 1 and 2 and Counts 8 and 9 would have been mutually admissible in separate trials, if not all the details that came out in the joint trial. We view this as sufficient to satisfy the *Drew* test, for that standard does not require that every item of evidence relating to one offense be admissible in a separate trial for the other, but rather looks in a broader sense to whether the rules relating to "other crimes" evidence have been satisfied.[76] And, at least in the case of non-violent crimes, it is ordinarily the fact of the defendant's having engaged in prior or subsequent criminal conduct that is likely to be damaging in the eyes of the jury rather than the details of its commission.

■ Thus, the possibility of "criminal propensity" prejudice or cumulation was not enlarged by the joinder of 1 and 2 with 8 and 9 since the evidence of each would have been "admissible in a separate trial for the other." [77] Moreover, we think that the evidence relating to the four tax counts, if not "simple," was at least sufficiently "distinct" to enable the jury to keep it separate, thus mitigating to some degree the danger of cumulation. Apparently, it is quite common for the Government to try jointly income tax offenses relating to two or more years.[78] Not only is this economical, in view of the liberal rules as to reciprocal admissibility already discussed, but the danger of confusion is probably less than in other types of cases since usually each offense relates to a return filed for a particular year. Though this was arguably more complex than the typical income tax case, the circumstances do not convince us that the four tax counts could not fairly be tried together.[79]

Appellant, however, argues that whatever might have been the case in a trial of the income tax counts alone, the addition of the larceny counts was fatally

---

72. *E.g.*, United States v. Magnus, 365 F. 2d 1007, 1011–1012 (2d Cir. 1966) ; Hamman v. United States, 340 F.2d 145, 149–150 (9th Cir. 1965).

73. United States v. Magnus, *supra* note 72, 365 F.2d at 1011.

74. See United States v. Magnus, *supra* note 72, 365 F.2d at 1011–1012.

75. United States v. Taylor, 305 F.2d 183, 185–186, 97 A.L.R.2d 791 (4th Cir. 1962) ; *cf.* Roe v. United States, 316 F.2d 617, 621 (5th Cir. 1963).

76. "Other crimes" evidence may include such variant forms as the mere date and nature of a prior conviction introduced to impeach credibility, or a detailed account of a prior or subsequent offense introduced to prove identity, the similarity of all the details of commission being a prerequisite to admissibility. *See Drew*, 118 U.S.App.D.C. at 16, 331 F.2d at 90.

77. *Drew*, 118 U.S.App.D.C. at 16, 331 F. 2d at 90.

78. *See, e.g.*, cases cited in note 72, *supra*.

79. We think the trial judge, at the time his ruling was entered, could reasonably have believed that the prosecutor would "be able to present the evidence in such a manner that the accused is not confounded in his defense and the jury will be able to treat the evidence relevant to each charge separately and distinctly." *Drew*, 118 U.S.App.D.C. at 18, 331 F.2d at 92. Though appellant cites in his brief a few examples of pieces of evidence introduced at the trial the relevance of which the jury might have confused, the motion to sever was never renewed on those grounds (though relief was requested at the trial because of appellant's problem with respect to testifying, discussed in the text, *infra*).

prejudicial. As we have previously observed, however, a trial of the income tax counts would necessarily have entailed proof of the offenses embodied in Counts 3 through 7. It is true that little if any of the evidence of the income tax offenses would have been admissible in a separate trial of the theft counts, but we need not consider whether the District Judge abused his discretion in failing to cure prejudice affecting those counts alone.[80]

Appellant also contends that he was embarrassed and confounded in presenting his defense, in that he wished to testify as to Counts 1 through 7 but to remain silent on Counts 8 and 9. In Cross v. United States, 118 U.S.App.D.C. 324, 335 F.2d 987 (1964), we held that such circumstances may constitute sufficient prejudice to require that a severance be granted.

> Prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence. His decision whether to testify will reflect a balancing of several factors with respect to each count: the evidence against him, the availability of defense evidence other than his testimony, the plausibility and substantiality of his testimony, the possible effects of demeanor, impeachment, and cross-examination. But if the two charges are joined for trial, it is not possible for him to weigh these factors separately as to each count. If he testifies on one count, he runs the risk that any adverse effects will influence the jury's consideration of the other

count. Thus he bears the risk on both counts, although he may benefit on only one. Moreover, a defendant's silence on one count would be damaging in the face of his express denial of the other. Thus he may be coerced into testifying on the count upon which he wished to remain silent. It is not necessary to decide whether this invades his constitutional right to remain silent, since we think it constitutes prejudice within the meaning of Rule 14.[81]

Appellant cites Cross for the proposition that "a timely and bona fide election by the accused to testify as to some counts and not as to others requires a Rule 14 severance." We think this reading of Cross is far too broad. Such a rule, in fact, would divest the court of all control over the matter of severance and entrust it to the defendant.[82]

The essence of our ruling in Cross was that, because of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma: whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other. Obviously no such dilemma exists where the balance of risk and advantage in respect of testifying is substantially the same as to each count. Thus unless the "election" referred to by appellant is to be regarded as conclusive—and we think it should not

---

80. Note 56, *supra*.

81. 118 U.S.App.D.C. at 326, 335 F.2d at 989. Appellant did not contend at trial that he was being compelled to give testimony in violation of his constitutional right against self-incrimination and he makes no such claim here.

82. This is true, at least, if the defendant is later free to change his mind about testifying. It might be possible to have a rule that an "election" is conclusive as to severance, but would constitute a "waiver" of the right to testify or not to

testify at the later separate trials. But such a rule, assuming its constitutionality, would have undesirable results since an intelligent decision whether to testify cannot be made before trial, but only after the defendant has had an opportunity to weigh, *inter alia*, the strength of the Government's case. *See Cross*, 118 U.S.App.D.C. at 326, 335 F.2d at 989. Indeed, a "waiver" rule would "cause the very type of prejudice *Cross* sought to avoid," in that it would deprive the defendant of his "usual free choice at trial." Note, 74 YALE L.J. 553, 559 (1965).

be—no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.[83] In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.[84]

Here, counsel for appellant represented to the court that appellant desired to remain silent on Counts 8 and 9 in order to avoid disclosing to the jury his disobedience of the instructions of the Majority Leader of the Senate regarding outside business activities, and because he feared prosecution under conflict of interest laws. He added that in his opinion appellant had a "legal defense" to Counts 8 and 9. No mention, however, was made of the nature and importance of the testimony he wished to give on the other counts.

Moreover, our examination of appellant's testimony at trial leaves us unconvinced that he had "ample reason not to testify on [Counts 8 and 9] * * * and would not have done so if [those counts] * * * had been tried separately."[85] In *Cross* we noted that the defendant's testimony on Count 1 was "plainly evasive and unconvincing," and on cross-examination he was "open to questioning concerning his generally tawdry way of life and his prior convictions."[86] No such harmful consequences resulted here from appellant's decision to testify on Counts 8 and 9.[87]

It is true that appellant's defense on those counts required him to reveal his disobedience of the instructions of his employer. But the explanation for the fee arrangement with Bromley, given by appellant in connection with Counts 8 and 9, was the same as that for the similar understanding with Tucker, which was a major part of the Government's proof of the 1961 tax evasion charge. It would appear, therefore, that appellant could not have escaped the need to give such testimony in a separate trial of Counts 1 through 7.

Nor are we persuaded by appellant's assertion that he had a "legal defense" to Counts 8 and 9 which made his testimony on those counts superfluous. At most, his defense of reliance on advice of counsel was relevant to the mechanics of filling out Bromley's 1963 return, involved in Count 8, and had no bearing whatever on numerous aspects of the conspiracy charged in Count 9. The Government's evidence as to the agreement that Bromley would report appellant's fees on his own return was strong, and would have been entirely unrebutted in the absence of a denial by appellant. And we think it is significant in this regard that appellant's testimony concerning the instructions of the Majority Leader and his forbidden "moonlighting" activities was brought out on direct examination rather than on cross-examination by the prosecution.[88]

---

83. It is true that in *Cross* "the appellants did not specify [at trial] the counts upon which they wished to remain silent and why." 118 U.S.App.D.C. at 326, 335 F.2d at 989. But here, unlike *Cross*, there is no indication that the trial court "precluded" defense attempts to make such a showing or that representation of appellant by his attorney was "half-hearted." *Id.* at 327, 335 F.2d at 990.

84. *Cf.* Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965); Gordon v. United States, 127 U.S.App.D.C. 343, 346–348, 383 F.2d 936, 939–941 (1967).

85. *Cross,* 118 U.S.App.D.C. at 327–328, 335 F.2d at 990–991.

86. 118 U.S.App.D.C. at 327, 335 F.2d at 990.

87. Appellant had no prior criminal record.

88. The unfavorable appearance from not testifying on Counts 8 and 9 would presumably have prejudiced him in the eyes of the jury as to those counts alone.

**978**

For these reasons, we decline to disturb appellant's convictions for the District Court's refusal to grant his request for separate trials.

### III. THE MOTION TO SUPPRESS

In his pretrial motion to suppress, appellant claimed that the Government's case was tainted by evidence obtained by illegal electronic eavesdropping. An affidavit attached to the motion referred to the discovery, in April 1963, of an eavesdropping device placed by the Federal Bureau of Investigation in the office of Edward Levinson, a business associate of appellant, in Las Vegas, Nevada.[89] The affidavit stated that during the period this device was in operation appellant participated in meetings in Levinson's office and made numerous telephone calls to that office. The affidavit also alleged on information and belief that electronic surveillance of appellant's conversations had taken place at several other places, including his Washington home and law office.

The Government's response denied that "any part of the evidence which forms the basis of this indictment was obtained from any improper source." The Government further denied that it "obtained any leads to the evidence behind these charges from any improper source," and asserted that the "information and evidence concerning the charges in the indictment was all legally obtained from independent third party sources." Finally, it denied that the F.B.I. had installed any eavesdropping device at appellant's home, law office, apartment, or any of the offices and telephones used by him in the Capitol.

Thereafter, the Government admitted the illegal "bugging" of Levinson's office in Las Vegas and disclosed to the defense that four conversations were overheard in which appellant had been either present or a participant. It further disclosed that conversations of appellant had been overheard through devices installed in the office of Benjamin Sigelbaum in Miami, Florida, and the hotel suite of Fred Black in Washington. The Government turned over to the defense the logs of those conversations in which appellant was identified as a participant or as having been present. The trial judge, at the Government's request, examined in camera all the logs of the three eavesdroppings in order to determine whether all of appellant's conversations had been made available to the defense.[90]

Prior to the hearing on the motion to suppress, the Government disclosed that a fourth electronic surveillance had recorded conversations in which appellant was a participant. The transcripts of these conversations were shown to defense counsel and turned over to the court, but the Government requested that they not be made public on the ground that the national security would be adversely affected by their disclosure. The court accordingly entered an order providing for an in camera hearing on the motion to suppress these materials and forbidding public disclosure by counsel of their existence and contents. Appellant declined to pursue his motion as to these materials, insisting on his right to a public hearing.[91]

With a "legal defense" to those counts, however, there would be no reason to fear that prejudice. Nevertheless, on the advice of able and experienced trial counsel, appellant did testify on those counts, thus subjecting himself to possible prejudice as to all counts.

89. Apparently, the device was affixed to a telephone, and recorded sounds in the office as well as both ends of telephone conversations.

90. Some of the Sigelbaum logs, which were voluminous, were examined by a District

Judge other than the trial judge. We find no merit in appellant's contention that this constituted an unlawful delegation of judicial authority.

91. Appellant complains of this ruling on appeal. We think, however, that the order neither constituted an abuse of discretion nor violated appellant's Sixth Amendment right to a public trial. The order directed full disclosure of the information to appellant, and merely placed reasonable limitations on its public divulgence. *Cf.* FED.R.CRIM.P. 16(e). Di Bella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7

At the hearing on the motion to suppress, counsel for the Government represented that "the Government has submitted to both the Court and to the defendant all conversations which were electronically monitored at any time, at any place, with respect to any conversations in which appellant was a participant or at which he was present." The Government submitted a memorandum from the Director of the F.B.I. to the Acting Attorney General, which stated that all logs of the surveillances referred to in appellant's motion to suppress, and all logs of conversations "at which defendant Baker was present or in which he participated in Las Vegas, Nevada; Miami, Florida; and Washington, D. C." had been furnished to the Department of Justice, and that "Baker's conversations were never covered by electronic surveillance at any other time or place." Submitted along with this memorandum was the affidavit of one of the Government trial attorneys that he had reviewed the logs furnished by the F.B.I. and had found no record of a conversation in which appellant was a participant or at which he was present except those contained in the Levinson, Sigelbaum and Black logs. As to the latter, it was stated that "they were never used by the Government to secure evidence or any leads to evidence which will be presented at the trial of this defendant."

The Government introduced other affidavits in an attempt to prove that the evidence to be introduced as to each count had been obtained from legitimate independent sources. A special agent of the Internal Revenue Service who had been in charge of the investigation of appellant's 1961 and 1962 returns stated that the investigation had been triggered by an anonymous letter relating to appellant's financial activities, and that evidence as to Counts 1 and 2 "was developed through third-party witness interviews and the examination, review and evaluation of appropriate bank, corporate and other financial records." The affiant stated further that all evidence had been obtained through "normal investigative leads," that at no time had an electronic eavesdropping device been employed, and that no evidence or leads thereto had been obtained "from any improper source."

The affidavit of one of the Government trial attorneys stated as to Counts 2 through 7 that the investigation into appellant's financial affairs conducted by the F.B.I. and the Internal Revenue Service disclosed that in November 1962 appellant had expended more than $45,000 in cash on his motel properties; that the investigators had been unable to ascertain the source of these funds; that a former Department of Justice employee had informed him in 1965 that appellant had recieved $100,000 in cash in the latter part of 1962 from California savings and loan companies; that in September 1965 a grand jury subpoenaed documents and heard testimony concerning the $100,000; and that none of the evidence relating to Counts 2 through 7 "was obtained from any improper source."

As to Counts 8 and 9, the chief prosecutor stated that in connection with the grand jury investigation of appellant he interviewed Wayne Bromley in February 1965; that Bromley disclosed that fees due appellant from a number of corporations had been paid by checks payable to him, and he had agreed to report the fees as his income; and that before that interview he had no knowledge or information regarding those matters.

L.Ed.2d 614 (1962), holds that an order granting or denying a pretrial motion to suppress is interlocutory since the motion is a preliminary stage in the criminal prosecution, rather than an independent proceeding, and any ruling thereon may be revised at trial. This is not at all to say that reasonable limitations may not be placed on a pretrial inquiry under FED.

R.CRIM.P. 41 without offending the Sixth Amendment. *Compare* Di Bella v. United States, *supra*, 369 U.S. at 129–130 n. 9, 82 S.Ct. 654, 7 L.Ed.2d 614 *with* Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *see* Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

These affidavits were admitted over defense objection. Though the affiants were present and available for cross-examination, the defense declined the opportunity to question them.[92]

Also present at the hearing were the F.B.I. agents who had monitored the Levinson, Sigelbaum and Black installations, and their supervisors. They were questioned by the defense, and testified that the purpose of the eavesdropping was to uncover possible connections of Levinson and Sigelbaum with organized crime and political corruption. As to the Black surveillance, they were primarily interested in "anything that came through the microphone pertaining to Black or his contacts." The agent testified that at the start of the investigation he was given appellant's name as an associate of Black, and told to "listen for" appellant. Two agents monitoring the Las Vegas device were informed that appellant was an associate of Levinson. No investigation of appellant was commenced by the F.B.I. field offices which received copies of the logs of appellant's conversations.

Appellant and Black were called by the defense, and testified that appellant had a key to Black's hotel suite and was welcome to use it at any time. Appellant testified that he made many telephone calls during the three-month period the listening device was in operation, and used the suite for meetings. He stated that many conversations held in the Black suite during this period related to his business and financial affairs, but was unable to point to any recorded conversation as being specifically relevant to matters covered by the indictment.

On the basis of this evidence, the court concluded that none of appellant's recorded conversations had "any causal connection with, or relationship to, the indictment."[93] However, because of the "Government's concession of illegality,"[94] the court ordered suppressed all those conversations "in which the defendant was a participant,"[95] i. e., those which had already been turned over to the defense. The court's treatment of the remaining logs differed as between the Black surveillance on the one hand, and the Levinson and Sigelbaum eavesdroppings on the other.

Prior to the hearing, the Government made available to the defense only the logs of conversations in which appellant had been identified by the monitors as a participant or as having been present. The remaining conversations involved either persons other than appellant or, in a few instances, unidentified participants. With respect to the Levinson and Sigelbaum devices, the court refused to suppress, or to allow the defense to examine, logs in either of these categories, on the ground that appellant would have standing to suppress only those conversations in which he had participated. The court relied on its *in camera* inspection of all the records in finding that appellant had not been a participant in any conversations except those turned over to the defense, and that, in any event, none of the undisclosed conversations had any "relevance to the matters contained in the indictment."[96]

However, "[i]n view of the defendant's special standing with respect to the Black suite," the court ordered suppressed all conversations overheard through that device which involved unknown participants, and provided further that the logs of those conversations should be delivered to the defense.[97] The court refused to suppress or to make available to the defense records of conversations in which the participants were identified as having been persons other than appellant.

---

92. In view of the opportunity to cross-examine, we see no error in the procedure followed here of introducing affidavits rather than eliciting live testimony from the witnesses.

93. 262 F.Supp. at 664.

94. *Id.* at 667.

95. *Ibid.*

96. *Ibid.*

97. *Ibid.*

Finally, the court provided that "the defense will be given the opportunity of further inquiry during the course of the trial, out of the presence of the jury to the degree deemed reasonable by the Court, to establish whether a causal connection exists between [the suppressed] recordings and evidence sought to be offered by the Government in support of the indictment." [98]

We have reviewed the record and are satisfied that, as to those records which were turned over to the defense, there was ample warrant for the trial judge's finding that the overheard conversations had no connection with the matters alleged in the indictment. We find no indication, despite appellant's contention to that effect, that the court improperly limited the scope of the hearing by foreclosing inquiry into the use made of the illegally seized materials. To the contrary, appellant was given every opportunity to question the agents who monitored the devices as well as those who supervised the surveillance, and to trace the "bugged" material through the F.B.I. files and channels of information.[99] Despite all this, the evidence at the hearing revealed not the slightest connection between appellant's illegally-intercepted conversations and the charges in the indictment. Moreover, the Government introduced evidence, not controverted by appellant, that legitimate independent sources of information gave rise to the indictment and led to the proof supporting the various charges. In short, we think the pretrial hearing was both full and fair, insofar as it related to those logs that had been delivered to the defense.

Appellant, however, contends that the hearing should have embraced the records of conversations other than those in which he was identified by the monitors as having been present or a participant. Specifically, he claims that the District Court erred in refusing to suppress and to make available for inspection by the defense (a) the logs of conversations recorded in the Levinson and Sigelbaum offices in which one of the participants was unidentified, and (b) the logs of all conversations recorded in the Black suite, whether or not appellant was present or a participant.

In discussing these questions, it is important to note at the outset that no considerations of possible injury to third persons[100] or to national security[101] have been urged by the Government here as reasons for limiting disclosure to the defense.[102] It simply ar-

98. *Ibid.*

99. In view of the opportunity afforded appellant to question the agents of the F.B.I. and the Internal Revenue Service, and the prosecuting attorneys who were directly involved in and had personal knowledge of the investigation of his affairs, the court did not abuse its discretion in quashing appellant's subpoena to the Director of the F.B.I.

100. At least as to the Levinson and Black eavesdroppings, it appears that the primary occupants of the premises involved had consented to public disclosure of the records. Moreover, in a situation where the Government has admitted illegal electronic surveillance, we would question the appropriateness of permitting it to resist disclosure to the defense on the ground that privacy of other persons would be violated—especially in view of the availability of means for protecting third parties short of absolute nondisclosure. *See* note 91, *supra.*

101. To the extent that the Government might have a general interest in preserving the secrecy of its methods of investigation, it would seem that that interest had already been infringed by disclosure of the records of conversations in which appellant had participated, and no purpose could be served by limiting further disclosure.

102. In Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968) (*per curiam*), the Court refused to accept an *ex parte* determination by the Department of Justice that information obtained through admittedly illegal electronic eavesdropping was "not arguably relevant to this prosecution," and remanded "for a hearing, findings, and conclusions on the nature and relevance to these convictions of any conversations that may be shown to have been overheard through unlawful electronic surveillance of petitioner['s] * * * place of business * * *." Thereafter, the Government moved to

gues that appellant would have no "standing" to suppress conversations, or evidence obtained therefrom, other than those in which he was a participant. And it contends that the *in camera* inspection by the court was adequate to insure that all recorded conversations in which appellant was a participant were turned over to the defense. We approach the issue as thus framed, and now proceed to consider whether appellant had standing [103] to suppress conversations recorded in the Black suite as to which he was neither present nor a participant, and whether he should have been given an opportunity to demonstrate his standing to object to conversations recorded in the Levinson and Sigelbaum offices involving unidentified participants.

Appellant argues that he had standing to suppress all conversations recorded in the Black suite, because of his "special" relationship to those premises, *i. e.*, the fact that he had a key, was authorized by the owner to use the suite at any time, and in fact did use it frequently for telephoning and business meetings. He relies heavily on Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960), in which the defendant had unsuccessfully sought to suppress narcotics seized in his presence during an illegal search of a friend's apartment, it appearing that the defendant had a key to the apartment and had occupied it on occasion. The Supreme

Court unanimously reversed the conviction, holding that the defendant was a "person aggrieved by an unlawful search and seizure" within the meaning of Rule 41(e) of the Federal Rules of Criminal Procedure, and therefore had standing to suppress the illegally seized evidence. The Court stated that standing did not depend on "as extensive a property interest as was required by the courts below," [104] and observed that

* * * it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. Even in the area from which they derive, due consideration has led to the discarding of these distinctions in the homeland of the common law. * * Distinctions such as those between "lessee," "licensee," "invitee" and "guest," often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards.[105]

Thus it held that "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." [106]

---

amend this order, requesting an initial *in camera* screening of the materials for possible relevance before disclosure would be made to the defense. This motion has been set for further briefing and reargument at the 1968 Term. 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1381 (1968).

103. Appellant has made no contention that the adoption of a general deterrence rationale for the exclusionary rule, see Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), necessitates abandonment of rules of standing to object to admission of illegally obtained evidence, see Comment, 34 U.Chi.L.Rev. 342 (1967), but rather argues that under the standards theretofore applied his interest in the Black suit suffices to confer standing. See Mancusi v. De Forte, 392

U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) ; Simmons v. United States, 390 U.S. 377, 390 n. 12, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968).

104. 362 U.S. at 263, 80 S.Ct. at 732.

105. *Id.* at 266, 80 S.Ct. at 733. In view of this language, we find unpersuasive the Government's attempt to characterize appellant as a mere "visitor."

106. *Id.* at 267, 80 S.Ct. at 734. As an alternative ground, the Court took into account the need to relax strict rules of standing where possession, necessary under traditional standards to establish standing, is also an element of the offense with which the defendant is charged. See *id.* at 263, 80 S.Ct. 725. The rule quoted in the text was, however, intended

We find this case indistinguishable from *Jones* insofar as appellant's relationship to the Black suite is concerned.[107] Certainly if physical evidence had been illegally seized there in appellant's presence he would have had standing to object to its introduction against him since, like the defendant in *Jones,* he would have been a "person legitimately on the premises." [108] However, since this case does not involve physical evidence but rather illegally intercepted oral communications, we must consider the applicability of *Jones* to wiretapping and electronic surveillance.

It could be argued that, despite *Jones,* only a party to an intercepted communication has the requisite interest to object to its admission or the introduction of evidence derived from it. Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942). However, because it is now clear that unlawful electronic surveillance violates the Fourth Amendment,[109] and in view of Supreme Court decisions clearly indicating that the protection afforded by the Amendment is not against technical trespasses but against invasions of privacy,[110] we think such a narrow view of standing to suppress unlawfully obtained "eavesdrop" evidence could not be justified. Appellant's interest in the Black suite reasonably warranted his expectation of freedom from governmental intrusion,[111]

and any "bugging" of those premises was a violation of his privacy.

In holding that appellant lacked standing, the District Court apparently relied on the statement in the *Jones* opinion that in order to have standing "one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else." [112] To the extent that the District Court's reasoning depended on its view that the eavesdropping was "directed," in the sense of subjective intent, at Black rather than appellant, we think it misconceived the import of the above language in the *Jones* opinion. For, as the Court itself observed in *Jones,* exclusion of evidence is "a means for making effective the protection of privacy," [113] and one who seeks standing must show "that he himself was the victim of an invasion of privacy." [114] Thus it would appear that one whose privacy has been invaded is "one against whom the search was directed * * *," regardless of whether it was the specific intention of the police to uncover evidence against him.[115]

Here, we have concluded that appellant's relationship to and interest in the Black suite made those premises, as to him, a constitutionally protected

---

to be "of general effect." Mancusi v. De Forte, *supra* note 103, 392 U.S. at 368 n. 5, 88 S.Ct. 2120, 20 L.Ed.2d 1154.

107. The District Court recognized appellant's "special standing" as to the Black suite, *see* note 97 *supra* and accompanying text, by giving him access to the logs of conversations involving unknown participants while refusing to do so with respect to the Levinson and Siegelbaum logs.

108. This would probably also be true even if he were not physically present during the search and seizure. *See* Spinelli v. United States, 382 F.2d 871, 878–879 (8th Cir. 1967).

109. Berger v. State of New York, 388 U.S. 41, 51, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

110. Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Silverman v. United States, 365 U.S. 505, 511–512, 81 S.Ct. 679, 5 L.Ed.2d 734, 97 A.L.R.2d 1277 (1961).

111. Mancusi v. De Forte, *supra* note 103, 392 U.S. at 368, 88 S.Ct. 2120, 20 L.Ed. 2d 1154.

112. 362 U.S. at 261, 80 S.Ct. at 731.

113. *Ibid.*

114. *Ibid.*

115. Moreover, we think there are sound reasons for presuming that a search of an area in which the defendant has an interest is "directed" at him, rather than premising protection of Fourth Amendment rights on retrospective analyses of subjective police intentions.

area from which he had a right to be free of unlawful governmental intrusion.[116] This was sufficient to confer standing on him to suppress any evidence garnered through the electronic surveillance of the Black suite, whether or not he was a participant in, or present at, particular overheard conversations.

For these reasons, we think that appellant ought to have been permitted to inspect the records of all conversations intercepted through the device in the Black suite, and that the pretrial hearing on the motion to suppress should have embraced the question of possible relevance of those conversations to the charges in the indictment. We are also of the view that appellant should have been given access to the materials from the Levinson and Sigelbaum eavesdroppings relating to conversations in which one or more participants were unidentified.

Appellant makes no claim of such a special relationship to the Levinson and Sigelbaum offices as would confer standing on him to suppress all conversations overheard there, and the question is only whether under the circumstances of this case he should have been allowed to attempt to establish his identity as a participant in one or more conversations. Inasmuch as the Government admitted both that it had overheard appellant's conversations through the Levinson and Sigelbaum devices and that it had intercepted other conversations involving unidentified persons, and in view of appellant's testimony that he had engaged in numerous conversations that might have been overheard through those devices, the possibility of appellant's having standing as to one or more of the undisclosed conversations was neither remote nor insubstantial. Certainly appellant was the person best qualified to ascertain whether any of the unidentified conversations was his, and the court's *in camera* examination of the logs, however diligent and careful, was hardly an adequate substitute, in these circumstances, for an adversary proceeding.[117]

Despite our conclusions that appellant should have been permitted to examine all records from the surveillance of the Black suite, and those from the Levinson and Sigelbaum installations relating to unidentified conversants, we reject appellant's contention that for these reasons reversal of his convictions and a new trial are required. The undisclosed conversations may or may not have been relevant to the charges in the indictment or have led to evidence introduced at trial. There could be no justification for now disturbing the convictions if in fact these conversations were irrelevant to the indictment and in no way tainted the Government's case.[118] It therefore appears to us that the appropriate disposition is to remand for a hearing on the nature and relevance of the conversations, with a new trial to be ordered only if made necessary by the findings and conclusions of the District Court entered upon the basis of such a hearing.[119]

In addition to the claimed inadequacy of the pretrial proceedings, however, appellant contends reversal is required because tainted evidence was in fact intro-

---

116. Constitutionally protected, not in the sense of property interest, but because his use of the premises reasonably justified an expectation of privacy, *see* notes 110 and 111 *supra* and accompanying text—an expectation which was defeated when the Government inaugurated its electronic surveillance of the premises.

117. *Cf.* Kolod v. United States, *supra* note 102; United States v. Coplon, 185 F.2d 629 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952).

118. Kolod v. United States, *supra* note 102; Hoffa v. United States, 387 U.S.

231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967). There is no suggestion of intrusion into communications between appellant and his attorney such as moved the Court to vacate the convictions in O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), and Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966). *See* Hoffa v. United States, *supra*, 387 U.S. at 233, 87 S.Ct. 1583, 18 L.Ed.2d 738.

119. *See* note 118, *supra*.

duced at trial. This contention is based upon the following events at trial: In his opening statement, defense counsel stated that appellant had flown to Los Angeles, California, on November 2, 1962, after receiving from a savings and loan executive $16,200 in cash, the subject of the larceny and larceny after trust charges in Counts 5 and 6. Appellant's counsel further stated that appellant returned to Washington on November 4, and gave the money, in a sealed envelope, to Senator Robert Kerr on November 5. Appellant's direct testimony was similar. On cross-examination, appellant corroborated the above details, adding that he had received the money on October 21 and immediately put the envelope in his office safe and left it there before going to California. He also stated that he had stayed in California on Friday and Saturday, November 3 and 4, and went to New York on Saturday. He then testified that he returned to Washington on Sunday, but that it could have been Saturday. At this point the prosecutor asked appellant whether it was not "a fact that you did not go to California on the 2nd, that you went to Las Vegas, Nevada, stayed at the Sands Hotel in a $47.-15 a day room?" Appellant replied that that was "entirely possible." After another prosecutorial reference to the $47.15 room, appellant stated that the room was "complemented to me" by his business partner, Edward Levinson. Then the prosecutor asked: "Does Mr. Levinson own the Fremont Hotel Gambling Casino in Las Vegas?" to which appellant replied that he owned a hotel containing a casino. The prosecutor asked: "Did you do any gambling in Las Vegas * * * ?" and appellant replied that he "might have."

Asked about what he did with the envelope when he returned to Washington, appellant replied, "I took the envelope from my safe home with me on Saturday at the close of business because I knew I had the meeting with the Senator * * * on Monday." The prosecutor then asked appellant whether he returned to Washington from New York, and appellant replied that his best recollection was a meeting in New York on Saturday. "And when did you return?" "Either on Saturday or Sunday." Finally, the prosecutor confronted appellant with evidence that he checked out of the Beverly Hills Hotel in Los Angeles at 8:06 P. M. on Sunday, November 4th, and took a night flight back to Washington, "and you wouldn't have gotten back until 5:00 or 6:00 A.M., and could never have gone to the Capitol and picked up that envelope."

Appellant's counsel moved to strike the Las Vegas cross-examination as based on an illegally seized conversation. He called attention to an intercepted conversation of November 2 between appellant and Levinson, as follows: "How are you Bobby? 8:45 tomorrow night you are coming in on TWA. Okay. I know Benny is there. Right now I'll put you into the Sands. I will get ahold of Cliff. I'll call him right now." At a lengthy bench conference, the prosecutor denied that the information had come from the intercepted conversation, and offered to prove that it had an untainted source. He stated that, subsequent to defense counsel's opening statement, the Government learned from an examination of the record of long distance calls charged to appellant's office that he had called Washington from Las Vegas on November 2; that Bromley had previously told the Government that appellant usually stayed at the Sands Hotel in Las Vegas; and that a check was then made of the registration records of the Sands Hotel. These statements were repeated in a post-trial affidavit of the prosecutor.

At appellant's request, the court instructed the jury to disregard all references to appellant's having been in Las Vegas on November 2—without, however, making any finding that the information had come from an improper source. The next day appellant moved for a mistrial based on the asserted prejudice from the challenged evidence. In denying this motion, the District Judge stated that he had "serious question as to whether or not my ruling [instructing

the jury to disregard the evidence] was correct in view of the Government's position respecting an independent source. Nevertheless, I gave you the benefit of the doubt."

■ With the record in this posture, we are unclear as to the District Court's reasons for denying appellant's motion for mistrial. Specifically, we are not apprised whether the ruling reflects a finding that the challenged evidence was untainted, or a feeling that any prejudice from the evidence was cured by the instruction to the jury. We express no opinion as to whether, in view of the court's instruction, the introduction of the evidence could be deemed "harmless beyond a reasonable doubt."[120] Instead, we remand for a hearing, findings and conclusions on the question of taint. In entering its findings and conclusions, the court should bear in mind that the burden is on the Government to prove that the information employed in cross-examination of appellant had an independent source.[121] Should the court conclude that the Government has failed to meet its burden, it is requested to consider the effect of the evidence on the jury and to enter additional findings and conclusions on the question of prejudice.

IV. APPELLANT'S REMAINING CONTENTIONS

■ In addition to his objections which go generally to all seven counts of which he was convicted, appellant also complains of a series of errors which he maintains vitiate each count separately. Appellant must in fact demonstrate that his convictions on all seven counts were erroneous, since the sentences are to run concurrently. Consequently, even if only one of the convictions is sustainable, the sentence is also, and the others need not be considered on

appeal. Hirabayashi v. United States, 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

Appellant's only complaint as to Count 2, apart from those already discussed concerning jury selection, joinder and electronic eavesdropping, is that the court erroneously limited the defense's cross-examination of Government witnesses. At issue on this count was whether appellant took for himself, and failed to report on his 1962 return, about $100,000 from savings and loan companies which he was to devote to the campaigns of seven senators and one representative who might prevent passage of laws unfavorable to the savings and loan industry. Each congressman was asked the same question: "To the best of your knowledge, did Robert G. Baker make any political contribution to you either on behalf of himself or others from October 21, 1962 to any time thereafter in connection with that November 1962 election?" Each answered, "He did not."

Appellant admits that he did not make the contributions personally, but maintains that he gave the money to Senator Kerr to give to the other congressmen. His attorney therefore asked on cross-examination: "Did Senator Kerr make funds available to you during—* * *." The Government's objection to this question was sustained. Appellant then asked that the Government's evidence on direct be stricken as irrelevant since the testimony did not prove that appellant had not indirectly made funds available to the congressmen. The court refused this request.

The Government argues that the court was right to sustain its objection to the question on cross-examination because at the time the question was asked appel-

---

120. Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); see Spencer v. State of Texas, 385 U.S. 554, 565, 87 S.Ct. 648, 17 L.Ed. 2d 606 (1967); Gregory v. United States, 125 U.S.App.D.C. 140, 145, 369 F.2d 185, 190 (1966).

121. Nardone v. United States, supra note 91, 308 U.S. at 341, 60 S.Ct. 266, 84 L.Ed. 307; United States v. Coplon, supra note 117, 185 F.2d at 637; cf. United States v. Wade, 388 U.S. 218, 240, 87 S.Ct. 926, 18 L.Ed.2d 1149 (1967); Murphy v. Waterfront Comm'n, etc., 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

lant had offered no testimony whatever concerning his having given money to Senator Kerr. Consequently, at that point in the trial whether the Senator had given money to other congressmen would have been irrelevant and confusing to the jury. Rather, the Government says, appellant should have recalled the congressmen as his own witnesses later in the trial. Appellant's only answer to this is that the procedure suggested would have forced him to "strike after the iron has cooled off."

■ We find no error. The trial judge is necessarily entrusted with a large measure of discretion to control the introduction of evidence and to assure that it is logically and understandably presented to the jury,[122] and we are not persuaded that that discretion was abused here. The court quite reasonably refused to permit the defendant to question witnesses about a matter relevant only to an affirmative defense which the defendant had not yet brought into the case by his own testimony.[123]

As to Count 8, appellant contends that the count fails to state an offense as a matter of law; that the trial judge's charge was erroneous; and that the evidence was insufficient to support his conviction.

Appellant's argument as to the legal sufficiency of Count 3 has two branches: First, he objects that, given the prior dealings between appellant and Bromley and the Government income tax form, the method of reporting chosen was the only one possible. But the Government responds that even if the income tax form has no space for reporting the income of someone else, the crux of the offense was intent to defraud, and absent such intent appellant and Bromley could surely have found some way, as by attaching an explanatory statement, of revealing the true nature of the transactions. Since there was such an intent, the form as executed and filed became inaccurate and fraudulent because it intentionally conveyed a false impression.

■ Second, with respect to the legal sufficiency of the count, appellant claims that no offense was stated because it alleged a "wash" transaction having no tax consequences. However, given the elements of wilfullness and intent to deceive, a false statement may be "material" notwithstanding the lack of tax consequences.[124] The evidence was uncontroverted both that Bromley never received the fees in question (indeed, he never even saw some of them), and that he paid no "legal and professional" fees to appellant.

■ Appellant argues that the evidence of wilfullness was insufficient because it was uncontroverted that he had relied on the advice of counsel given after full disclosure. The Government, however, introduced evidence showing that appellant had not made full disclosure to counsel of relevant facts, and in particular that the use of Bromley as an intermediary had been initiated as part of a scheme to conceal appellant's income. The judge charged that if appellant had made full disclosure to his attorneys and then acted on the advice given him, he could not be convicted, even if the advice was incorrect. The jury decided this issue adversely to appellant, and we see no basis for disturbing its verdict.

■ Finally, appellant contends that it was error for the trial judge to refuse to charge the jury as to what would, under the circumstances, have been a permissible manner of reporting. We agree with the Government, however, that the central issue before the jury was one of intent; the question was whether the return which appellant assisted in pre-

122. United States v. Bender, 218 F.2d 869, 873–874 (7th Cir.), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955); Wright v. United States, 87 U.S.App.D.C. 67, 183 F.2d 821 (1950).

123. See United States v. Bender, supra note 122.

124. Cf. Sansone v. United States, 380 U.S. 343, 353, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

paring was wilfully false in material respects, made with intent to deceive the Government, and this issue was properly presented to the jury and resolved against appellant on ample evidence.

Appellant's objections to his conviction on Count 9 are essentially the same as those with respect to Count 8. The only additional claims are directed toward the judge's charge to the jury, which appellant contends was deficient in several respects. First, he maintains that the instructions were overly general, and failed to apprise the jury adequately of the elements of the offense in relation to the evidence introduced at trial.

However, the Government points out that appellant's counsel appeared to agree when, at a lengthy conference on instructions, the court suggested that a factual charge might hurt the defense. Counsel replied, "We are asking your Honor, in these requested instructions, to state facts only in very limited situations where we need it as a predicate to something we are asking for." The court gave specific factual instructions on the "advice of counsel" defense to Count 8 and on the question of intent. He told the jury that appellant should be acquitted on Counts 8 and 9 if his sole motivation in having his clients issue checks in Bromley's name was either as a means of practicing law in the District of Columbia without a license, or in order to hide his "moonlighting" activities from his employer; the jury was left in no doubt as to the need to find a specific intent to defraud the United States in its ascertainment and collection of taxes, and this was all that was required.

Finally, appellant asserts that the instructions as to consummation of the conspiracy were incorrect. Bromley's testimony supported an inference that the original purpose of the plan was both to conceal the sources of appellant's income and to avoid payment of taxes, but that after the investigation had commenced the scheme was modified as alleged in Count 8. Appellant objects to the statement in the court's instructions that the fact that the conspiracy was not carried out was "immaterial," pointing out that the failure to accomplish the alleged object of a conspiracy has some bearing on whether the parties had ever intended to accomplish it. However, we think the judge's full charge on this point adequately apprised the jury of the relevance of the failure of consummation:

> They are not charged in the Ninth Count with the violation of the Internal Revenue laws as such and, to make out a charge of conspiracy under this count, it is not necessary for the Government to establish that the violation which it is alleged they conspired to commit was in fact committed.

> The fact that the conspiracy was not carried out successfully, or even that it was not carried out at all is immaterial. The crime of conspiracy is committed as soon as the conspiracy is formed, and at least one overt act, that is, at least one step in the direction of carrying it out is performed by one of the members of a conspiracy.

We agree with the Government that, taken in context, the instruction was not misleading. It merely advised the jury that a conspiracy offense is made out, whether or not the criminal objectives are achieved, as soon as there is an illicit agreement and an overt act.

In sum, we find no merit in appellant's contentions with respect to Counts 2, 8 and 9. We express no opinion on the other claims of error made by appellant.

We retain jurisdiction of this appeal and remand to the District Court for further proceedings consistent with Part III of this opinion.

So ordered.