OPINION OF THE COURT
John Carey, J.
"[T]he method by which the District Attorney gained posses *375 sion of the disputed items — a subpoena returnable ’forthwith’ to himself * * * should not be replicated.” So said the Court of Appeals on March 27, 1990, in People v Natal (75 NY2d 379, 384-385 [1990]). But replication, in the same District Attorney’s office, was only a few days in coming. Faced with such pointed disregard of CPL article 610, this court must fashion appropriate remedial action, or become itself an accomplice.
Testimony was taken at a hearing held between June 15 and 20,1990, pursuant to an order of this court dated May 23, 1990. Based thereon, the following facts are found.
Two District Attorney’s subpoenas duces tecum dated March 5, 1990, were transmitted by fax by Greenburgh Detective Richard Constantino, who was on his first homicide case as "lead detective”. The party served, Manufacturers National Bank (MNB), in Detroit, had been contacted at least three times by Constantino, to inform MNB what was needed. This was done on instructions of Assistant District Attorney Kevin Kennedy, who prepared the subpoenas, directed them to be served and "did not give too much thought to jurisdictional niceties.” They called for the production of records "forthwith” in "supreme court,” even though both Kennedy and Constantino had personally attended defendant’s arraignment a month before, in County Court. Another subpoena duces tecum was sent to MNB, dated March 29th, also faxed by Constantino. Faxing subpoenas was unique in Constantino’s experience.
On March 29th, the day before Natal (supra) was published in the New York Law Journal, MNB addressed to Constantino an envelope containing copies of records, with a cover letter beginning: "Dear Detective Constantino: In response to your subpoena”. The unanimous Court of Appeals concluded its opinion as follows:
"Subpoenas, of course, are process of the courts, not the parties (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 610.20, at 264; see, CPL 610.10 [2], [3]; Hagan, Impounding and the Subpoena Duces Tecum, 26 Brooklyn L Rev 199 [I960]). While by statute it is the District Attorney who issues a subpoena duces tecum (CPL 610.25 [1]), the subpoena is nevertheless a mandate of the court issued for the court (see, Matter of Spector v Allen, 281 NY 251, 259; People ex rel. Drake v Andrews, 197 NY 53).
"It has long been recognized that District Attorneys may *376 not issue subpoenas except through the process of the court, and they exercise the power to compel witnesses to produce physical evidence only before a Grand Jury or a court where a proceeding is pending (CPL 610.20; People v Hamlin, 58 AD2d 631, 632; People v Boulet, 88 Misc 2d 353, 354; People v Arocho, 85 Misc 2d 116). CPL 610.25 (1) makes clear that where the District Attorney seeks trial evidence the subpoena should be made returnable to the court, which has 'the right to possession of the subpoenaed evidence.’ It is for the court, not the prosecutor, to determine where subpoenaed materials should be deposited, as well as any disputes regarding production (CPL 610.25; People v Hasson, 86 Misc 2d 781; Matter of Nwamu, 421 F Supp 1361 [SD NY]).
"By circumventing the court, the District Attorney avoided all the protections provided against abuse of the subpoena process, and succeeded in transforming a court process into a function of his own office (see generally, American Bar Assn, Standards Relating to Administration of Criminal Justice, Prosecution Function § 3.1 [d] [1974]). Such conduct is all the more disturbing in light of apparent prior admonitions by Trial Judges to the District Attorney concerning similar misuse in other cases. * * *
"[I]t hardly needs stating that the District Attorney’s subpoena practice should not be replicated.” (75 NY2d, supra, at 384-385.)
Constantino’s admitted purpose in sending the first subpoenas was to continue his investigation of the homicide for which defendant had already been indicted a month earlier. He was seeking to establish a financial profile on defendant and was looking for specific wire transfers. He opened the MNB envelope, with the bank’s return address appearing directly above his own, when it arrived in his mail early in April, postmarked in Michigan on March 29, a Thursday.
Constantino "began to review” the envelope’s contents, as he himself put in it the police log. He claims to have then put it away in his desk, intending to get back to it later. Although it was at least two weeks before he turned it over to Kennedy, he claims that, for lack of time alone, he did not in the meantime look in detail at the contents. This is difficult to believe and cannot be found as a fact. Since he got the records for the purpose of investigating, and since he was for the first time "lead detective” on a homicide, it is far more likely that, busy or not, he studied them in detail during the two weeks he had them.
*377 On Monday, March 26th, Kennedy mailed a Grand Jury subpoena duces tecum[1] dated "March, 1990” to American Express, returnable "forthwith”, and saying, "please send information to” Kennedy. Noticing the error later that week, Kennedy sent a letter dated Monday, April 2, enclosing a replacement trial subpoena, also returnable "forthwith” but in "supreme court,” without instructions where to send material, and again referring to the case as "Investigation No. 89-7H”, its preindictment designation. Kennedy faxed a letter to American Express dated April 17, 1990, enclosing a subpoena duces tecum returnable April 30 before this court, to which the letter specified material should be sent.
Kennedy received an American Express envelope addressed to Constantino, postmarked April 20, 1990, containing records and a cover letter addressed to defendant in care of Kennedy at the District Attorney’s office. This envelope had been opened at the time it was delivered to the court by the District Attorney’s office. Constantino swore he could not remember having received it, while Kennedy said he got it from Constantino around May 14th.
Kennedy is Deputy Chief of the Homicide and Special Investigations Bureau of the Westchester County District Attorney’s office. As such, he supervises homicide investigations in the county. He joined the District Attorney’s office in 1983 and was admitted to the New York Bar the following year. He had never before this case issued a trial subpoena, only Grand Jury subpoenas, but knew that trial subpoenas are required to be returnable on a designated date in a designated court. He also knew that no trial date had been set at the time he issued the subpoenas. His efforts to keep up with new legal developments, which he admits is required by his official position, depend on his current caseload. His office has "no uniform systematic distribution” of new legal developments, although different persons may disseminate recent decisions on an ad hoc basis.
Kennedy did not explain why he arraigned for some subpoenas to be faxed while he simply mailed others. Why he required Constantino to fax any of them instead of doing so *378 from his own office, Kennedy swore he could not explain except that Constantino had MNB’s fax number. He said it never occurred to him that having the detective send the subpoenas would risk the subpoenaed materials being sent to Constantino rather than to Kennedy, or even to the court as required by law. The court can only conclude, however reluctantly, that Kennedy wanted the subpoenaed material to go directly to Constantino, who said he needed that material to further his investigation of the already indicted defendant.
Kennedy faxed two further subpoenas duces tecum to MNB, this time from his own office, both dated April 17. These were made returnable in this court on April 30, a date established for the court to decide defendant’s omnibus motions but on which no court appearances were scheduled. Apparently in consequence of one or both of these subpoenas an envelope arrived at the court from MNB on May 11th. This has not been opened.
Kennedy also mailed a subpoena duces tecum dated March 29 to MCI Telecommunications, returnable "forthwith” in this court. He received an Airborne Express envelope from MCI with records and a cover letter dated April 10 referring to this indictment by its number and starting: "Dear Mr. Kennedy: I am in receipt of your subpoena dated March 29, 1990”. That envelope was opened before it was delivered to the court, as was another Airborne Express envelope from MCI with a cover letter dated May 10th. Kennedy explained that both envelopes were opened by District Attorney staff members.
After checking the dates on the April 10 MCI envelope’s contents, which the staff had removed and which Kennedy "perused”, he became concerned and thought he should "double check” CPL article 610, with which he had previously been only "somewhat familiar.” On April 11 it "dawned on” him that "impropriety” might have been committed. April 11th was the first time he was aware that he was not supposed to receive the fruits of a trial subpoena duces tecum. He had not seen Natal (supra) in the March 30 New York Law Journal or otherwise become aware of it. Advance sheets are not always circulated in his office, he said, but in any event did not include Natal until early May. Kennedy admitted that he "apparently did not do enough legal research.”
On April 12 Kennedy brought his concerns to Assistant District Attorney James A. McCarty, to whom the case had *379 been assigned for trial. That same day, Kennedy called Citicorp, to which he had mailed a subpoena duces tecum dated March 29, returnable "forwith” (sic) in County Court. He told his Citicorp contact not to send materials to him but to the court. He was informed, however, that materials had already been mailed by Citicorp, so he told his staff not to open mail from that source. Ultimately the District Attorney’s office delivered to the court an unopened envelope from Citicorp addressed to Kennedy at his office. He previously had either told his contact to mail to him or else had failed to prevent her from drawing the otherwise obvious inference that he, with whom she had been dealing, should be the recipient.
The names of some of the companies subpoenaed, Citicorp, MNB and American Express, were learned for the first time from a credit report which Kennedy obtained without a subpoena or court order. He is not familiar with the requirements of General Business Law § 380-b, in which subdivision (a) lists the only permissible purposes for which a consumer reporting agency may furnish a consumer report. Kennedy said he took the word of an accountant that no court order was required and depended on past practice of the District Attorney’s office, not on legal research. The District Attorney’s office acknowledged at oral argument that the report was illegally obtained.
CONCLUSIONS OF LAW
It is only "as an officer of [the] * * * court” that a District Attorney "may issue a subpoena of such court”. (CPL 610.20 [2].) Being an officer of the court places a solemn responsibility on all lawyers to act with honor and due respect towards the judiciary. Lawyers in law enforcement positions have the additional responsibility voluntarily undertaken when they take an oath to uphold the laws of the State and Nation. When persons in that position break the law, the breach is far more serious than when ordinary citizens are at fault. When issuing "a subpoena of such court,” a prosecutor must be scrupulous in the extreme in order not to either betray the court as whose agent he or she acts or to defame the profession to which he or she is privileged to belong.
The following violations are held to have occurred. First, it is admitted that the General Business Law was breached when Kennedy obtained a credit report on defendant. The fruits of this violation included the identity of MNB, Citicorp and American Express as parties with financial records on *380 defendant. Second, serving subpoenas on MNB in Detroit exceeded the authority of CPL 610.30 (2), which provides that "A subpoena of a superior court * * * may be served anywhere in the state.” The reach of this statute could not be expanded by any agreement between Kennedy and MNB. Kennedy was misusing this court’s mandate in so doing. A subpoena is "a process of a court”. (CPL 610.10 [2].)
The third statute violated was CPL 610.25 (1), providing that "the court * * * shall have the right to possession of the subpoenaed evidence.” Kennedy had no such right to possession, nor any right to delegate possession to Constantino, who most certainly had no right to possession of his own.
The District Attorney’s office at oral argument urged the court to treat materials received by parties other than the court from MCI differently from the rest. The reason given was that the name of MCI did not stem from the admittedly illegal credit report. This is a reasonable suggestion to which the court adds a further distinction: among those materials that were the fruits of a poisoned tree, materials from MNB were doubly poisoned because of the additional abuse of the court’s mandate in serving it out of New York State. Consequently, gradations of poison can be discerned: MCI materials the least poisoned, MNB materials the most, American Express and Citicorp materials somewhere between. It remains, therefore, to determine whether the court has the power to combat this poison, and if so, by what means.
At oral argument, the theory was advanced by an Assistant District Attorney that this court has no power to remedy the defective behavior set forth above, or even to inquire into it. This court’s power to protect judicial functions and enforce the Criminal Procedure Law is circumscribed, he said, by the defendant’s lack of standing to object on constitutional grounds to any search and seizure of her bank and telephone records. For such lack of standing persuasive authority is cited, but defendant’s standing need not be ruled upon because the matter is not so easily put to rest.
A Judge confronted with such a situation must act, not only to discipline lawyers actually appearing before him or her but for the protection of the authority of all Judges who may be similarly situated. In the words of Canon 1 of the Code of Judicial Conduct: "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should *381 himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.” While the issues here are statutory rather than constitutional, the Supreme Court’s exhortation in Elkins v United States (364 US 206, 223 [1960]), that the courts not become "accomplices in the willful disobedience of a Constitution they are sworn to uphold” is equally applicable to disobedience of a statute. Respect for rules of conduct governing law enforcement personnel, whether constitutional or statutory, are of concern not just to persons whose rights may be breached by their violation but also to those responsible for the proper functioning of the criminal justice system.
The concern of Judges for the proper functioning of the criminal justice system is especially strong where the rights and prerogatives of Judges themselves are infringed upon. In the present instance this court’s exclusive right to possession of subpoenaed materials has been defied. The suggestion that this court has no power to protect its own prerogatives needs no refutation. The lawyer who issues a judicial subpoena acts as an agent of the court. A principal is not without means of dealing with a disloyal agent.
While appellate authority prior to Natal (75 NY2d 379, supra) is scant,[2] that case, so recently pronounced by the highest court in the State, leaves no doubt that this court may not ignore such usurpations of its prerogatives as are here involved. The only issue is what remedy to apply. The District Attorney at oral argument suggested analogizing to the area of discovery. CPL 240.70 (1) permits sanctions against parties who fail to make discovery as required: "[T]he court may order such party to permit discovery of the property not previously disclosed, grant a continuance, issue a protective order, prohibit the introduction of certain evidence or the calling of certain witnesses or take any other appropriate action.” Adopting the District Attorney’s suggestion gives the court wide latitude in selection among various remedies. Various ones have been considered in reported cases. In Drake v City of Rochester (96 Misc 2d 86 [Sup Ct, Monroe County 1978], affd 74 AD2d 996 [1980]), a civil suit for damages was brought. The City Court of Rochester declined to dismiss *382 charges despite a breach of the following American Bar Association Standard: " 'It is unprofessional conduct for a prosecutor to secure the attendance of persons for interviews by use of any communication which has the appearance or color of a subpoena or similar judicial process unless he is authorized to do so.’ ” (People v Boulet, 88 Misc 2d 353, 354 [1976], supra.) Quoting the same standard, the Supreme Court, New York County, suppressed statements taken from defense witnesses by using apparent subpoenas. "The District Attorney is barred from using them or any evidence or information obtained from these illegal interviews with witnesses (Silverthorne Lbr. Co. v United States, 251 US 385). The District Attorney shall bear the burden of convincing the trial court that evidence he seeks to introduce or information he seeks to employ in cross-examination was not obtained from the illicit interviews of August 29, 1975, but had an independent source (Baker v United States, 401 F 2d 958; Nardone v United States, 308 US 338, 341).” (People v Arocho, 85 Misc 2d 116, 119 [1976], supra.) Where a defense counsel was at fault, subpoenas were withdrawn with leave to apply for judicial trial subpoenas shortly before trial. (People v Hasson, 86 Misc 2d 781 [Sup Ct, Richmond County 1976], supra.)
A constructive solution that might have been useful here, if the District Attorney’s office had taken up the court’s invitation to provide testimony from a superior of Kennedy to help the court understand the context in which his actions occurred, is suggested by Rutledge v State (245 Ga 768, 771, 267 SE2d 199, 201 [Sup Ct 1980]), where: "The district attorney concedes that his office improperly issued written communications purporting to be subpoenas requiring witnesses to appear at his office prior to trial for investigatory purposes. American Bar Association Standards, the Prosecution Function, 3.1 (1971). Defense counsel brought this practice to the trial court’s attention prior to trial and moved for suppression of the testimony of all witnesses who had received such a written communication from the office of the district attorney. The trial court agreed that the procedure was improper. So did the district attorney, who answered that the practice already had been discontinued.” Here, by contrast, the District Attorney’s office declined to go on record as admitting impropriety, let alone promising reform. Therefore the other side of the Rutledge coin, whereby the Georgia Supreme Court declined to reverse the conviction because "[h]arm as well as error must be established by an appellant in order to secure a *383 reversal of his conviction” (245 Ga, supra, at 771, 267 SE2d, supra, at 201), need not be heeded. The remedy of suppression, to the extent it is analogous in severity to reversal, may remain open to consideration.
Two objectives must be achieved in fashioning relief. One is deterrence. The other is to minimize prejudice to defendant. Deterrence will not be sought at the exclusive expense of Kennedy, who has been punished enough already by being left to twist alone in the wind without supporting testimony from his superiors. Deterrence must nonetheless be assured, or these unfortunate events are likely to recur. The sanction that meets both objectives is suppression. However, it is too severe for application except in circumstances close to the most grievous.
Such circumstances have been shown as to the materials from MNB which were obtained in violation of both CPL 610.25 (1) and 610.30 (2) besides being the fruit of a violation of the General Business Law where some of the subpoenas were effectively issued by a detective, who unlike a District Attorney never has any such authority.
Sufficiently grievous circumstances have not been shown as to the MCI records, which were not the fruit of the illegal credit report and which were delivered to the court with reasonable, if not commendable, promptness. In between are the materials from American Express and Citicorp. They are the fruit of a poisonous tree, and if defendant can show “undue prejudice” as the District Attorney’s office put it in oral argument, then they will be suppressed. For such a showing, the burden rests on defendant.
Accordingly, upon the papers recited in the court’s decision/ order of May 23, 1990, the evidence adduced at the hearing held between June 15 and 20, 1990, and the oral arguments thereat, it is:
Ordered, that the motion to suppress materials obtained by the District Attorney’s office from Manufacturers National Bank by means of subpoenas duces tecum served after the indictment herein was voted is granted where materials were opened, and the same may not be used as part of the prosecution’s case-in-chief, and the motion is denied as to unopened materials, and both parties shall have equal access in either case; and it is:
Ordered, that the motion to suppress materials so obtained from MCI Telecommunications is denied, but both parties shall have equal access thereto; and it is:
*384 Ordered, that decision is reserved on the motion to suppress materials so obtained from American Express and Citicorp, pending proof of undue prejudice to defendant resulting from the manner in which such materials were obtained, and access shall be equal.

. A Grand Jury subpoena was also served on National Westminster Bank on February 2, the day the Grand Jury voted to indict defendant; no effort was made to stop delivery thereunder, and material was received by the District Attorney’s office on March 16th, a month after the end of the Grand Jury’s term. The material was turned over to the defense but not to the court.

. "It cannot be disputed that a Judge has the overriding duty to preserve the integrity and honor of the judicial system. He possesses the power to enforce order and control behavior and has the authority to regulate the conduct of attorneys in his courtroom” (Matter of Moxham v Hannigan, 89 AD2d 300, 302 [4th Dept 1982]).