OPINION OF THE COURT
Raymond E. Cornelius, J.
A sealed indictment was returned, in this case, on March 26, 1998, charging the defendant with murder in the second degree in violation of Penal Law § 125.25 (4). This charge is based upon claims that under circumstances evincing a depraved indifference to human life, she recklessly engaged in conduct which created a grave risk of serious physical injury or death to her daughter, Tysheka Wright, who was less than 11 years old, including leaving the child unclothed in conditions which resulted in death by hypothermia.
Pursuant to the provisions of CPL 710.20 (1) and (3), a motion has been made to suppress potential evidence consisting of tangible property allegedly obtained by means of an unlawful search and seizure, and a statement claimed to have been “involuntarily made” within the meaning of CPL 60.45. A hearing has been held, as provided under CPL 710.60 (4). In addition, the defendant requests that the court fashion an appropriate remedy concerning records of the Catholic Family Center, *14 which were obtained by the Monroe County District Attorney’s Office pursuant to a subpoena duces tecum issued following completion of the Grand Jury proceeding and after return of the indictment.
The proof, adduced at the hearing, established that members of the Rochester Police Department responded to the defendant’s residence, located at 64 Michigan Street, in the City of Rochester, at approximately 10:18 p.m. on the evening of January 22, 1998. This action was prompted by a radio dispatch, following a 911 call from a female, who was crying and reported two murders at this address. The officers who initially responded opened an unlocked front door, and found the defendant laying on the kitchen floor. She was partially clothed and generally incoherent. In addition, they observed a knife located nearby, and white powder over her body. They then went upstairs, and found the deceased child, fully clothed, laying on a bedroom floor. Thereafter, another officer, who observed an open container of birth control pills in the kitchen, accompanied the defendant, in an ambulance, to Rochester General Hospital.
Upon arrival at the hospital, the defendant was nonresponsive to medical personnel, and at one point, was restrained in order to receive medical assistance. A decision was made to perform a lavage, which is commonly referred to as a procedure whereby the stomach is “pumped”. Thereafter, the defendant became alert, and although unable to communicate verbally, responded to questions by holding up three fingers to indicate “yes”, two fingers to indicate “no”, and wrote on a pad.
Members of the Rochester Police Department were present with the defendant throughout the above procedures at the hospital, and indeed, may have assisted in the restraint utilized in order to effectuate medical treatment. Two plainclothes investigators, who worked out of the section office covering the area of 64 Michigan Street, began to speak to the defendant around 12:30 a.m. on the morning of January 23, 1998. The defendant acknowledged, by nodding of the head, that her daughter was dead. The investigators advised her that they were concerned about her other three children, and requested permission to search the house and garage at her residence. They completed a consent to search form, which was received into evidence as exhibit 8, and the defendant signed this document after it was fully read to her. In addition, the defendant was advised of her constitutional rights by the reading of a card, received into evidence as exhibit 6, and indicated that she understood her rights and would agree to speak with the *15 police by holding up three fingers and nodding in response to two printed questions which appear on the card. Between 12:30 a.m. and 1:15 a.m., the two investigators conducted an interview with the defendant, in the hospital, during which the defendant primarily responded to questions by writing on a pad.
At some point, Sargeant Mark Merklinger of the Homicide Unit arrived at the hospital and requested that the defendant be transported to his unit at the Public Safety Building, which is the central police headquarters. Although there was some question whether or not the defendant had formally been discharged from the hospital, she left the hospital at approximately 2:30 a.m., wearing a hospital gown and slippers, and in the company of the two investigators. En route to the Public Safety Building, she was advised that two other investigators were waiting to talk with her concerning the death of her daughter. She arrived at the Public Safety Building at about 2:55 a.m. on the morning of January 23, 1998.
At approximately 10:30 p.m. on the evening of January 22, 1998, one of the investigators, who responded to the scene at 64 Michigan Street, was approached by an individual, who identified herself as Adlina Riggins. This individual stated that her son, Tyrone Riggins, lived at the address with his wife and four children, but he was presently staying at her home, located in another part of the city. Mr. Riggins was ultimately transported to the scene, and introduced to Investigator Terrance Coleman, who asked for permission to search the house. At 12:46 a.m. on January 23, Mr. Riggins signed a consent to search form, which was received into evidence as exhibit 9.
Testimony at the hearing indicated that technicians from the Rochester Police Department also responded to 64 Michigan Street on January 22, but did not immediately process the scene. Shortly after 12:45 a.m. on the morning of January 23, they commenced taking photographs. In addition, between 3:00 a.m. and 4:38 a.m., various tangible objects were seized, including carpet samples, cleaners, and clothing.
Investigator Coleman transported Mr. Riggins to the Public Safety Building, and took a statement from him. Thereafter, at about 3:25 a.m., he began to speak with the defendant in another room within the homicide division. Although she initially spoke in a whisper, the defendant made certain verbal statements during the next 50 to 55 minutes. Investigator Coleman then commenced preparation of a written statement by use of a word processor, based upon a question and answer format *16 with the defendant. This process was completed at approximately 5:40 a.m., and a printed statement was then given to the defendant. According to the investigator, the defendant read the first six or seven lines aloud and the remainder to herself. He then read the statement aloud to the defendant, after which she signed the document. This was received into evidence, at the hearing, as exhibit 7.
Sometime during the morning of January 23, members of the defendant’s family contacted the Monroe County Public Defender’s Office. At approximately 11:30 a.m., a County Court Judge signed an order assigning that office to represent the defendant pursuant to their application. An Assistant Public Defender then proceeded to the Public Safety Building, with a copy of the order, but was refused access to the defendant, purportedly based upon advice from the Monroe County District Attorney’s Office. Later in the day, at about 1:40 p.m., another Assistant Public Defender did meet with the defendant in one of the interview rooms. At about 6:00 p.m. on the same day, the defendant was released from custody, without being charged with any crime, presumably because the Medical Examiner’s Office was unable to certify the case as a homicide at that point in time.
In addition to the foregoing, other evidence was seized and/or collected following the events of January 22-23, 1998. For example, on January 28,1998, clothing and other items, including hair samples, were collected from the Medical Examiner’s Office. On the previous day, January 27, 1998, a County Court Judge issued a search warrant, authorizing the police to search the premises at 64 Michigan Street for the purpose of seizing certain property, including a bedroom door leading to an enclosed porch, as well as all hardware and a locking device. Also, the warrant authorized scientific testing for atmospheric conditions, and access to the house for a review and sampling of insulation material. On February 2, 1998, Tyrone Riggins, along with other members of his family, met with a representative of the District Attorney’s Office. At that time, he gave the representative keys to the residence, and consented to entry upon the premises for whatever purpose was required by the authorities, including testing. On February 3-4, 1998, tests were conducted at 64 Michigan Street, and certain tangible property was seized pursuant to the aforementioned search warrant, including a door, locking mechanism, and samples of wallboard.
*17 I
First, the court has concluded that the motion to suppress evidence should be denied, insofar as addressed to any statements given to members of the Rochester Police Department prior to 11:30 a.m. on January 23, 1998. Counsel for the defendant maintains that her client was in police custody, and any statements made to the police would have been “involuntarily made”, as that term is defined in CPL 60.45. If, of course, a defendant is in custody, the People must establish a waiver of their constitutional rights before police questioning. The two investigators, who interviewed the defendant at the hospital, disagreed, between themselves, whether or not she was free to leave that facility. However, the subjective belief of the police officers, unless communicated to a suspect, is not determinative on the issue of whether or not someone is in custody. (See, People v Joy, 114 AD2d 517 [2d Dept 1985].) Furthermore, the determination of custody is not dependent upon a particular defendant’s subjective state of mind, but rather, objectively, what a reasonable person, innocent of any crime, would have believed under all the circumstances. (People v Yukl, 25 NY2d 585 [1969], rearg denied 26 NY2d 883, cert denied 400 US 851; also see, People v Bookless, 120 AD2d 950 [4th Dept 1986], lv denied 68 NY2d 767.) In the pending case, under all of the circumstances, and notwithstanding the fact that the defendant was released on the evening of January 23, 1998, the court has concluded that a reasonable, innocent person would, nevertheless, have believed that they were in custody, both at the hospital and certainly later, at the police headquarters.
Although the defendant was in custody while at the hospital, the court further finds that she was fully advised of her Miranda rights before any questioning by the police. At that time the defendant was conscious and alert, and made a knowing, intelligent and voluntary waiver of her constitutional rights and agreed to speak with the police. The defendant was in continuous custody of the police after leaving the hospital, and it was unnecessary to repeat the Miranda rights before questioning in the homicide division of the Public Safety Building. (See, People v Glinsman, 107 AD2d 710 [2d Dept 1985], lv denied 64 NY2d 889, cert denied 472 US 1021 [1985]; also see, People v Martinez, 115 AD2d 664 [2d Dept 1985].) There was no evidence adduced at the hearing that the police, at any time, made any promises to the defendant, or resorted to the use of threats or force to induce her to make any statement.
Although the People have not indicated an intent to introduce evidence of any statements made following the sign *18 ing of the written statement, which occurred at approximately 5:40 a.m. on January 23, 1998, the defendant’s right to counsel attached when the Assistant Public Defender presented himself at the police headquarters later the same morning. (People v Rogers, 48 NY2d 167 [1979].) Indeed, this court would hold that there should be suppression, as a matter of law, of any statement made after 11:30 a.m., at which time a judicial order was signed appointing the Monroe County Public Defender’s Office as attorney for the defendant. In the court’s opinion, this is the kind of significant judicial activity whereby the right to counsel attaches to a suspect in custody, and which cannot be waived without the presence of counsel. (See, e.g., People v Coleman, 43 NY2d 222 [1977]; People v Sugden, 35 NY2d 453 [1974].) This is notwithstanding the fact that a formal criminal proceeding was not commenced against the defendant on January 23, 1998, and there may be some question concerning the County Court’s authority to issue an ex parte order assigning counsel under those circumstances. (See, County Law § 722.)
II
The motion to suppress tangible property, which was seized by the Rochester Police Department, should be denied for several reasons. First, the initial entry of the police into defendant’s residence on the evening of January 22, 1998, falls clearly within the emergency doctrine. (See, People v Mitchell, 39 NY2d 173 [1976], cert denied 426 US 953.) Although the police certainly made observations of items in plain view, items were not photographed and/or seized until after consents to search were obtained from the defendant and her husband. As earlier discussed, the written consent executed by the defendant, at the hospital, followed a brief discussion concerning the welfare of her children. Under all of the circumstances, including the fact that the right to refuse consent to search was printed on the written consent form, and that after signing the form, the defendant was fully cooperative with the police, the court finds that such consent was freely and voluntarily given by the defendant. (See, People v Gonzalez, 39 NY2d 122 [1976].)
A consent to search, of course, may be given by a defendant, or alternatively, by a third person who also possesses control over the premises, such as a spouse. (See, People v Harper, 119 AD2d 587 [2d Dept 1986], lv denied 68 NY2d 757.) Thus, in the pending case, Mr. Riggins, as an occupant of 64 Michigan Street, along with his wife and children, would have had authority to consent to the search. He did inform Investigator *19 Coleman, at the Public Safety Building, that he had moved from the residence several days prior to January 22, 1998. However, at the very least, there was apparent authority to consent, on his part, earlier in the evening. (See, People v Adams, 53 NY2d 1 [1981], rearg denied 54 NY2d 832, cert denied 454 US 854 [1981].)
The court would agree with the People’s position that the defendant had no expectation of privacy concerning articles removed from the Medical Examiner’s Office following the autopsy of the child. Further, a review of the search warrant, issued by County Court, discloses that the police were authorized to search for items seized from the defendant’s home on February 3 and 4, 1998, as well as perform scientific testing at that location. The defendant has failed to establish any deficiency in the search warrant itself.
Ill
The major issue concerns records of the Catholic Family Center which were delivered to the District Attorney’s Office, following presentation of the evidence to the Grand Jury and after return of the indictment, pursuant to a subpoena duces tecum issued by that office. In a letter memorandum dated July 14, 1998, the Assistant District Attorney responsible for prosecuting this case represents that, prior to the issuance of the subpoena, she knew that Tysheka Wright’s grandmother, Adlina Riggins, as well as her parents, Tyrone Riggins and the defendant, had been engaged in counseling at Catholic Family Center, which is a private social services agency. Although the grandmother had raised the child for most of her life, custody had been transferred to the defendant in 1997, when Tysheka was four years old, and during the same year, the defendant had purportedly expressed wishes to surrender the child for adoption.
A District Attorney, as an officer of a criminal court, may issue a subpoena of such court, subscribed by himself, for the attendance of a witness in such court or Grand Jury proceedings. (CPL 610.20.) The term “subpoena” includes a “subpoena duces tecum”, which may require the witness to- produce specified physical evidence. (CPL 610.10.) The physical evidence, subject of a subpoena duces tecum, must be retained by the court, or if subpoenaed for purposes of a Grand Jury proceeding, the evidence must be retained by the Grand Jury or the District Attorney on behalf of the Grand Jury. (CPL 610.25.) In People v Natal (75 NY2d 379 [1990], cert denied 498 US 862), the Court *20 of Appeals emphatically declared that the power of a District Attorney to compel witnesses to produce physical evidence is limited to a Grand Jury proceeding or a court where a proceeding is pending, and in the latter event, should be made returnable before the court. Thus, the court held that it was improper for the District Attorney to subpoena production of evidence, following completion of a Grand Jury proceeding, and made returnable prior to trial in the District Attorney’s Office.
In the pending case, the District Attorney’s Office initially sought to justify issuance of the subpoena duces tecum for the records of the Catholic Family Center by reliance upon Social Services Law § 422. That section pertains to the State-wide central register of child abuse and maltreatment. Subdivision (4) (A) thereof directs that such reports, including other information, written reports, or photographs, in the possession of the Department of Social Services or local social services departments are confidential and may only be made available to specified entities. These include a Grand Jury, upon a finding that the information in the record is necessary for determination of charges before such body, or a District Attorney, Assistant District Attorney, or investigator employed in the Office of the District Attorney, when such official requests such information and states that the information is necessary to conduct a criminal investigation or prosecution and it is reasonable to believe that such records may be related thereto. (Social Services Law § 422 [4] [A] [f], [Z].) The records, which are the subject of the subpoena duces tecum in the pending case, are unrelated to reports of any abuse and maltreatment to the State-wide register, and in any event, are records of a private agency, subpoenaed after completion of the Grand Jury investigation. The District Attorney’s Office now concedes, in the aforementioned letter of July 14, 1998, that it was improper to issue the subpoena duces tecum. Therefore, the issue before the court becomes the appropriate remedy, if any, for the improper delivery and retention of such records.
Following the decision in People v Natal (supra), courts have struggled with the appropriate remedy to be imposed regarding evidence obtained by a District Attorney’s Office pursuant to an improperly issued subpoena duces tecum. Such records not infrequently contain material which would be otherwise protected as a confidential communication, such as the physician-patient privilege. Appellate courts have the benefit of a retrospective view of the record, in a given case, and sometimes, a criminal conviction is affirmed, notwithstanding *21 the improper issuance of a subpoena duces tecum, on the basis that a defendant ultimately waived the physician-patient privilege at the time of trial. (See, e.g., People v Kral, 198 AD2d 670 [3d Dept 1993], lv denied 82 NY2d 926.) In other instances, convictions have been affirmed based upon a determination that the prosecutor did not utilize the information obtained by means of the subpoena duces tecum, but later, obtained the same material as the result of the defendant placing such records in issue at trial. (See, People v Carkner, 213 AD2d 735 [3d Dept 1995], lv denied 85 NY2d 970, 86 NY2d 733.) Indeed, in People v Natal (supra), the Court of Appeals, in effect, held that the improperly issued subpoena duces tecum was harmless error, while at the same time condemning such practice by District Attorneys’ Offices. (Also see, People v McNeill, 204 AD2d 975 [4th Dept 1994], lv denied 84 NY2d 829.)
Trial courts, of course, are faced with making prospective rulings, and it may be difficult to determine, in advance, the prejudice to a defendant which will accrue from evidence in the possession of the District Attorney’s Office. This court has now conducted an in camera inspection of the records of the Catholic Family Center. Suffice it to say, at least a portion thereof relates to behavioral problems of the child, and extensive interviews with the parents, including the defendant, with references to described modes of punishment administered to the child. The information contained in the records may well constitute confidential information within the social worker privilege of CPLR 4508, and thereby, use of such material at trial would be potentially prejudicial to the defendant.
The People have referred the court to the decision in People v Warmus (148 Misc 2d 374 [1990]) which contains an extensive discussion of the remedial options available to a court. These include permitting additional discovery, granting a continuance, issuing protective orders, and prohibiting introduction of evidence, all as provided in CPL 240.70 (1) pertaining to the imposition of sanctions for failure to comply with discovery. In addition, the court discussed the remedy of suppression, and its possible deterrent effect upon the practice of improperly issuing subpoenas. However, the court concluded that this remedy should be reserved for only the most grievous circumstances, and ultimately issued an order providing both parties with access to the improperly subpoenaed material.
It is interesting to note that in People v Warmus (supra) the court reserved decision on a motion to suppress the use of credit reports improperly subpoenaed and obtained in violation of the *22 General Business Law, pending proof of undue prejudice. In this court’s opinion, therein lies the very problem with such an approach. In situations involving subpoenaed material, which may be statutorily protected as a confidential communication or otherwise, it is difficult, if not impossible, to prospectively ascertain the prejudice accruing to a defendant. The records of the Catholic Family Center are now in the possession of the court, and a determination could be made concerning whether all, or only a portion, of the records constitute privileged material. However, this ignores the fact that the records have been in the possession of the District Attorney’s Office, and although the Assistant District Attorney represents that she has not read the records, an investigator in that office has reviewed the material. Indeed, the Assistant District Attorney asserts that the investigator was the one who initially issued the subpoena duces tecum. It is therefore difficult to ascertain the extent to which these records have been utilized in developing other evidence. Furthermore, any attempt to fashion a compromise remedy only condones a practice which should be well known as improper to prosecutors throughout the State.
Admittedly, suppression is a drastic remedy, especially in a case of this nature, involving the death of a child. Indeed, the exclusionary rule is generally reserved for constitutional violations, which result in unlawfully obtained evidence in criminal cases. In People v Currier (221 AD2d 805 [3d Dept 1995]), the Court affirmed a conviction in reliance upon a finding that improperly subpoenaed material had not been utilized and that the District Attorney’s Office had consented to a preclusion order prior to trial. In other areas involving noncompliance with the statutory requirements, preclusion has been held to be the appropriate remedy. (See, e.g., People v Lopez, 84 NY2d 425 [1994]; People v Bernier, 73 NY2d 1006 [1989]; People v O'Doherty, 70 NY2d 479 [1987].) These decisions involve the notice requirement under CPL 710.30 which includes a statutory remedy of preclusion for noncompliance, with certain exceptions, such as waiver by a defendant making a suppression motion. However, they are instructive because, like the provisions for issuance of a subpoena, they involve statutory mandates and prejudice is not an initial factor in determining the appropriateness of a preclusion order.
In this court’s opinion, an order precluding the introduction of the improperly subpoenaed records, or other evidence derived therefrom, on the People’s direct case would achieve the desired result of being an effective remedy. Arguably, the *23 District Attorney would not be prejudiced because presumably sufficient evidence had already been collected and presented to the Grand Jury in order to obtain an indictment for murder in the second degree. In the event that the defendant waives any privilege of confidentiality, by, for example, her testimony or making use of the records as part of the defense case, the People would be permitted leave to apply for permission to admit such records, or evidence derived therefrom, as a part of their rebuttal case.
Based upon the foregoing reasons, it is ordered that the motion pursuant to CPL 710.20 (1) to suppress potential evidence consisting of tangible property seized by the Rochester Police Department is hereby denied, and it is further ordered that the motion pursuant to CPL 710.20 (3) to suppress statements made to members of the Rochester Police Department prior to 11:30 a.m. on January 23, 1998 is hereby denied, but granted as to any statements made thereafter, and it is further ordered that the Monroe County District Attorney is precluded from offering records of the Catholic Family Center as evidence on their direct case.